STATE OF LOUISIANA
v.
BRANDON LIZOTTE.
No. 2007 KA 1447.
Court of Appeal of Louisiana, First Circuit.
February 8, 2008.
Not Designated for Publication.
SCOTT M. PERRILLOUX, District Attorney, DONALD WALL, PATRICK WALSH DUNN, Assistant District Attorneys, Counsel for Plaintiff/Appellee, State of Louisiana.
PRENTICE L. WHITE, Counsel for Defendant/Appellant, Brandon Lizotte.
Before: CARTER, C.J., PETTIGREW and WELCH, JJ.
CARTER, C.J.
The defendant, Brandon Lizotte, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. After entering a plea of not guilty, the defendant filed a motion to suppress inculpatory statements. Following a hearing, the motion to suppress was denied. The defendant was found guilty as charged by a unanimous jury. He filed a motion for post verdict judgment of acquittal, which was denied. The defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The defendant appeals, designating three assignments of error. For the reasons that follow, the defendant's conviction and sentence are affirmed.

FACTS
After about three months of dating, the defendant and Nora Roundtree became engaged. Based on advice from her friends, Sabah Ahmed and Jignesh Patel, and from her mother, Nora called off the engagement. Ahmed and Patel were in a relationship and lived together in an upstairs apartment in Hammond, Tangipahoa Parish.
On the evening of July 21, 2005, the defendant drank a half pint of vodka and then went to Nora's work to bring her lunch. According to the defendant, he planned to break up with Nora, so he drank "to be strong" in order to be able to go through with the breakup. However, according to Nora, she refused the lunch and broke up with the defendant. The defendant drove back toward Abita Springs where he lived. He purchased some more liquor, parked in the Pelican Athletic Club parking lot in Mandeville, and for about two hours, continued to drink. According to the defendant, he drank another bottle of vodka. He then drove home. A few hours later, he left his house, purchased a fifth of gin, and drank about half of the bottle. Sometime between midnight and 1:00 a.m. (July 22), the defendant drove to Hammond. Because the defendant perceived Ahmed as a cause of his breakup with Nora, he disliked Ahmed and was angry with her.
After driving around Hammond a while, the defendant parked in front of Ahmed's apartment and sat in his pickup truck for a few hours. Finally, he retrieved a knife from his glove compartment and slashed a few of the tires on Ahmed's and Patel's cars.[1] Ahmed and Patel were awakened when Patel's car alarm went off. Patel used his remote to turn off the alarm. Moments later, at about 4:00 a.m., the defendant kicked down the door to Ahmed's apartment and, still armed with his knife, attacked Ahmed and Patel. He stabbed Ahrned several times and knocked her to the ground. He then attacked Patel and stabbed him twenty-six times, killing him. During the defendant's attack on Patel, Ahmed ran downstairs to the apartment of a neighbor, who called 911.
The defendant left the scene and drove back home to Abita Springs. Along the way, he threw his knife into the woods somewhere near a public building. At home, he removed his bloody clothes, placed them in a garbage bag, and put the bag in the back of his truck. The defendant was subsequently arrested and brought in for questioning. He confessed to the stabbing of Patel to Detective Sergeant Jerry Hall with the St. Tammany Parish Sheriffs Office and to Lieutenant Chuck Muse with the Hammond City Police Department.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues that the trial court erred in denying his motion to suppress inculpatory statements made to police officers while he was under the influence of alcohol. Specifically, the defendant contends that his drunken condition prevented him from fully understanding what he was saying while being questioned by the police. The defendant also contends that his motion to suppress should have been granted because, at the time of his arrest, he asked to speak with an attorney.
We address the defendant's request for counsel first. In Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), the Supreme Court held that an accused having expressed his desire to deal with police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges, or conversation with the police. Before a suspect may be subjected to further interrogation after he requests an attorney, there must be a showing that the "suspect himself initiates dialogue with the authorities." State v. Wall, 457 So.2d 1225, 1228-1229 (La. App. 1st Cir. 1984) (quoting Wyrick v. Fields, 459 U.S. 42, 45-46, 103 S.Ct. 394, 395, 74 L.Ed.2d 214 (1982) (per curiam)). Furthermore, even when the accused initiates further communication, exchanges, or conversations with the police, the prosecution still has the burden of showing that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. State v. Carr, 530 So.2d 579, 587 (La. App. 1st Cir.), writ denied, 533 So.2d 354 (La. 1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989); see Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983).
When the defendant was arrested, he was handcuffed and Mirandized[2] by Corporal Jack Admire with the St. Tammany Parish Sheriff's Office. Corporal Admire placed the defendant in his unit at which time the defendant asked about the condition of the person he stabbed in Hammond. Corporal Admire informed the defendant that he did not know anything about the incident in Hammond and that his role was strictly as a custodial pickup for the Hammond City Police Department. The defendant stated that he did not want to say anything. Corporal Admire reminded the defendant that his rights had been read to him and that he had the right not to answer questions. The defendant stated that he knew his rights and that he wanted to speak to an attorney.
Corporal Admire brought the defendant to the Law Enforcement Complex (LEC) in Covington to complete paperwork. Acadian Ambulance was contacted to assess the injuries to the defendant's left hand. Based on the extent of his injuries, Corporal Admire took the defendant to St. Tammany Parish Hospital, where he was treated. Corporal Admire then took the defendant back to LEC, where he was turned over to Detective Sergeant Hall for questioning. According to Corporal Admire, from the time he was arrested until the time he was released to Detective Sergeant Hall, the defendant, unprompted, repeatedly asked about the stabbing and about the condition of the victim.[3] The defendant was in Corporal Admire's custody for about two-and-one-half to three hours.
Based on these facts, we find that the defendant requested to speak to an attorney. We further find that the defendant continually initiated dialogue with Corporal Admire about the stabbing and, as such, subjected himself to further interrogation by the police. At the motion to suppress hearing,[4] Corporal Admire testified that at least a dozen times, the defendant continually attempted to communicate with him about the crime. Each time the defendant engaged Corporal Admire, Corporal Admire informed him that he had no information about the incident in Hammond and that he knew nothing about it. At trial, Corporal Admire testified, "From the point that I began my report and getting information from him until the time I turned him over to investigations, he continually tried to engage me in conversations about the victim in Hammond and what was going on with that." Corporal Admire further testified at trial:
There were numerous instances where he tried to engage me in conversation: on the way to the LEC the first time, on the way to the hospital, at the hospital, on the way back from the hospital, at the LEC while we were waiting for the investigators. There were numerous occasions. And I advised him each and every time I knew nothing except we were requested to make contact with him and hold him for Hammond PD. That was all I knew of the situation in Hammond.
The only issue remaining is whether the defendant, following his initial contact with Corporal Admire, knowingly and intelligently waived his right to counsel. When Corporal Admire released the defendant to Detective Sergeant Hall, Corporal Admire did not inform Detective Sergeant Hall that earlier that morning the defendant had requested counsel.[5] Regardless, Detective Sergeant Hall informed the defendant of his rights via a standardized Miranda rights form. The defendant indicated that he understood his rights and signed the form. There were no threats made or promises or inducements to talk. The defendant confessed to the stabbings and at no time during his confession did he request to speak to an attorney. We note also the defendant's familiarity with the legal system. At trial, the defendant testified that he had been convicted of "counterfeit," burglary of an office building, and burglary of a home. He pled guilty to attempted simple burglary of a police vehicle, simple battery on a police officer, resisting arrest, terrorizing a police officer, and twelve misdemeanors. During his confession, the defendant stated that he had a "long history of interrogations." The defendant also stated that he had been incarcerated in Michigan, Louisiana, and Indiana. When asked what he was in jail for, the defendant stated, "Lots of things. I got a, I got a record as long as my arm. I think, I think I got a total of uh, eight, thirty convictions."
An individual's prior experiences with the criminal justice system are relevant to the waiver of rights inquiry because they may show the individual has, in the past and perhaps on numerous occasions, been informed of his constitutional rights against self-incrimination both by law enforcement and judicial officers. See State v. Robertson, 97-0177 (La. 3/4/98), 712 So.2d 8, 30, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998). The defendant also had attended college for at least a year.
While the defendant initially requested counsel, we find that he initiated further communication by repeatedly asking Corporal Admire to discuss the crime. Under the totality of the circumstances, we find nothing in the record that suggests the defendant's waiver of counsel was anything but knowing and voluntary. As such, the trial court did not err when it determined that the defendant was not deprived of his constitutional right to counsel.
We now turn to the issue of the defendant's challenge to the voluntariness of his confession because of his alleged intoxication. Before a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. LSA-R.S. 15:451. It also must be established that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. Since the general admissibility of a confession is a question for the trial court, its conclusions on the credibility and weight of the testimony are accorded great weight and will not be overturned unless the evidence does not support them. See State v. Patterson, 572 So.2d 1144, 1150 (La. App. 1st Cir. 1990), writ denied, 577 So.2d 11 (La. 1991). The trial court must consider the totality of the circumstances in determining whether a confession is admissible. State v. Hernandez, 432 So.2d 350, 352 (La. App. 1st Cir. 1983). Testimony of the interviewing police officer alone may be sufficient to prove a defendant's statements were freely and voluntarily given. State v. Mackens, 35,350 (La. App. 2 Cir. 12/28/01), 803 So.2d 454, 463, writ denied, XXXX-XXXX (La. 1/24/03), 836 So.2d 37.
When a confession is challenged on the ground that it was not freely and voluntarily given because the defendant was intoxicated at the time of the confession, the confession will be inadmissible only when the intoxication is of such a degree as to negate the defendant's comprehension and to make him unconscious of the consequences of what he is saying. Whether intoxication exists and is sufficient to vitiate the voluntariness of a confession are questions of fact, and the ruling of the trial court on this issue will not be disturbed unless unsupported by the evidence. State v. Williams, 602 So.2d 318, 319 (La. App. 1st Cir.), writ denied, 605 So.2d 1125 (La. 1992).
At the motion to suppress hearing, Detective Sergeant Hall testified that during his questioning of the defendant, the defendant did not exhibit any signs that suggested he was under the influence of drugs or alcohol. He further stated that the defendant's responses to the questions were timely and on point. At trial, Detective Sergeant Hall testified that the defendant was not forced or coerced in any manner to give a statement, nor was he offered or promised anything in return for making a statement. Lieutenant Muse, who also testified at the motion to suppress hearing, stated that, although he knew the defendant had been drinking earlier, at the time they interviewed him, he felt like the defendant was "in control of all his functions and knew exactly what was going on and what was taking place at that time." Lieutenant Muse further stated that nothing about the defendant indicated to him that he was impaired by drugs or alcohol and that the defendant's "answers made good sense, and he responded to them in a normal fashion, just like any other two people would converstate [sic]." At trial, Lieutenant Muse testified that the defendant "understood very well" the questions he was asked and that his answers were appropriate to the questions. Lieutenant Muse further testified that the defendant was not coerced or threatened in any fashion to give a statement, nor was he offered or promised anything in return for making a statement. At trial on cross-examination, the defendant was asked if he was drunk when he gave his statement to Detective Sergeant Hall and Lieutenant Muse. The defendant responded, "No. No. But I was still under the influence of alcohol."
Nothing in the record before us suggests that the defendant's alleged intoxicated state was of such a degree as to negate his comprehension or make him unconscious of the consequences of what he was saying to Detective Sergeant Hall and Lieutenant Muse. We find the trial court's conclusions are supported by the evidence and, thus, will not be overturned.
Moreover, even if the defendant's confession should have been suppressed, the admission of it into evidence was harmless error. An error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely not attributable to the error. State v. Koon, 96-1208 (La. 5/20/97), 704 So.2d 756, 763, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997). The evidence of the defendant's stabbing of both victims was overwhelming. Ahmed testified that the defendant stabbed her and knocked her down. She also witnessed the defendant on top of Patel stabbing him continuously without pause. The defendant admitted in his own testimony at trial that he stabbed Patel. When the defendant was asked on direct examination if he knew he was totally responsible, he responded, "Yes, of course, because I chose to drink, and I had every opportunity to go a different direction." Considering the foregoing, we are convinced that even had the defendant's confession been erroneously introduced into evidence, the guilty verdict actually rendered was surely not attributable to the error.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant argues the trial court erred in denying his challenges for cause of prospective jurors Harry Calmes and Jeannie Tinnerello. Specifically, the defendant contends that Mr. Calmes could not have been impartial because he knew the prosecutor and her father. He further contends that Ms. Tinnerello indicated that she could not consider the defense of intoxication and that she was one hundred percent in favor of law enforcement and less tolerant of people who committed crimes.
Defense counsel challenged for cause Ms. Tinnerello, but the trial court denied the challenge because it found that she was rehabilitated. The defendant objected to the trial court's ruling. Ms. Tinnerello was peremptorily struck and, therefore, never served on the jury. Mr. Calmes was selected as the twelfth juror to serve. Defense counsel could not strike Mr. Calmes because, at that point, he had already exhausted all of his peremptory strikes. However, defense counsel made no attempt to challenge Mr. Calmes for cause. As such, defense counsel did not lodge an objection to Mr. Calmes's serving on the jury. Accordingly, there is no issue before this court regarding Mr. Calmes's service as a juror. See LSA-C.Cr.P. arts. 800A, 841A. The only issue before us is whether the trial court erred in denying the cause challenge of Ms. Tinnerello.
An accused in a criminal case is constitutionally entitled to a full and complete voir dire examination and to the exercise of peremptory challenges. LSA-Const. art. I, § 17(A). The purpose of voir dire examination is to determine prospective jurors' qualifications by testing their competency and impartiality and discovering bases for the intelligent exercise of cause and peremptory challenges. State v. Burton, 464 So.2d 421, 425 (La. App. 1st Cir.), writ denied, 468 So.2d 570 (La. 1985). A trial court is accorded great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Martin, 558 So.2d 654, 658 (La. App. 1st Cir.), writ denied, 564 So.2d 318 (La. 1990).
A defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror. LSA-C.Cr.P. art. 800A. Prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant has exhausted his peremptory challenges. To prove there has been reversible error warranting reversal of the conviction, defendant need only show (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1280-1281. It is undisputed that defense counsel exhausted all of his peremptory challenges before the selection of the twelfth juror. Therefore, we need only determine the issue of whether the trial court erred in denying the defendant's challenge for cause to Ms. Tinnerello.
Louisiana Code of Criminal Procedure article 797 states in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
. . .
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
. . .
(4) The juror will not accept the law as given to him by the court[.]
During voir dire, the trial court spoke to several of the jurors individually. Following is the relevant colloquy between the trial court and Ms. Tinnerello:
The Court: Okay. Thank you. Do any of you have any friends or relatives employed by the DA's office, the Department of Corrections, the City or State Police, the Sheriffs Office, or any other law enforcement? I'm talking about DEA, FBI, CIA, anybody else?
. . .
Ms. Tinnerello: Yes. My brother-in-law is Larry Westmoreland, who is employed by the Sheriffs Department for many years.
The Court: Anything about that relationship, do you have such a close relationship, Thanksgiving dinner that you would, you know?
Ms. Tinnerello: The only thing is I tend to support law enforcement people 100 percent.
The Court: Uh-huh (affirmative response). But you can listen  if the one that you, let's say, whoever you knew, I don't have enough room here to write everybody's down, but let's say you know one of them and they got up there and said today is Christmas, you going to believe them?
Ms. Tinnerello: No, I wouldn't believe that. But I'm very  in my waning years, I've become very opinionated and less patient with people who commit crimes than maybe when I was younger.
The Court: Well, do you understand that at this point in time, Mr. Lizotte is [sic] only been accused of a crime?
Ms. Tinnerello: Yes, I do.
The Court: You know, everybody is here starting out even today. Nobody is convicted of anything.
Ms. Tinnerello: I do understand that.
The Court: It's for the jury to decide after hearing the evidence presenting off  from that stand and whatever other documentary evidence. . . . But right now everybody is innocent. So the question is: Can you sit there and listen to what everybody's got to say, all of the witnesses, and sort of put it together and come up with a conclusion, or are you going to, just because somebody in a nice blue uniform is going say something, you going to tend to believe it and not disregard the other 20 witnesses or whatever.
Ms. Tinnerello: I sure will try.
The Court: All right.
Ms. Tinnerello: I'll try.
Later during voir dire, the following exchange between defense counsel and Ms. Tinnerello took place:
Mr. McNary [defense counsel]: Does anyone here feel that way? (No hands raised.) Ms. Tinnerello, does the fact that Mr. Lizotte was indicted for second-degree murder and sits there in front of you, does that cause you to lean one way or another in regard to his innocence or guilt?
Ms. Tinnerello: No, not at this time.
Mr. McNary: Not at this time?
Ms. Tinnerello: I am, however, watching his movements and [his] face very carefully, just to try to get a feel of what kind of young man he is.
Mr. McNary: So do you feel that by watching his movements, you can tell at this time whether he's innocent or guilty of second-degree murder?
Ms. Tinnerello: No. But I think that body language does say a lot.
Mr. McNary: Let me ask you this, Ms. Tinnerello, if the jury were to retire right now and you had to vote on his guilt or innocence, what would your vote have to be?
Ms. Tinnerello: I couldn't say. I haven't heard the evidence. Mr. McNary: Well, Mr. Lizotte is presumed to be innocent. Ms. Tinnerello: But I want to listen to all the evidence.
Mr. McNary: Well, that's the point I'm trying to make. You haven't heard any evidence.
Ms. Tinnerello: No.
Mr. McNary: So right now, you can't decide whether or not 
Ms. Tinnerello: No.
Mr. McNary:  whether Mr. Lizotte is guilty or innocent. Nor can anybody else.
Ms. Tinnerello: No.
Following this exchange, defense counsel explained the defense of intoxication. He then asked if there was anyone who could not consider intoxication as a defense. The following exchange among defense counsel, Mr. Maninna[6] and Ms. Tinnerello then took place:
Mr. Maninna: I believe that would be [a] hard defense for me to take into consideration.
Mr. McNary [defense counsel]: I understand that, sir, and I think there are a lot of people that would feel that way. Is your problem with it such that you do not feel that if the judge instructed you that you must take that defense into consideration, do you feel that you would be unable to do so?
Mr. Maninna: [It] certainly would be difficult.
Mr. McNary: Well, I can tell you right now in a case like this, everything a juror does is difficult. . . . I'm just sensing, sir, from what your body language is and from what you're telling me, when you say would be difficult, what you really mean, in all candor, is you could not consider the intoxication defense; is that true, sir?
Mr. Maninna: I believe that would be a valid statement. Mr. McNary: Sir?
Mr. Maninna: I believe that would be a valid statement.
Mr. McNary: And again, like I said. This is America. You're entitled to that opinion. What none of us is entitled to, as jurors, is to disregard the law, however we feel about it. And I commend you, sir, for your candor; and I hope that if there's anybody else here who feels similarly that they would 
Ms. Tinnerello: I feel the same way.
Mr. McNary: Thank you, Ms. Tinnerello. Anyone else who feels they would be unable to 
Ms. Abreo: It would be difficult for me.
Mr. McNary: Difficult similar to Mr. Mannina, in that you really couldn't consider it?
Ms. Tinnerello: Yes.
Mr. McNary: Of course, I already believe that you've got other difficulties sitting as a juror in this case.
Ms. Tinnerello: I'm just being honest with you.
Mr. McNary: And that's just one more.
Ms. Tinnerello: Yes.
Mr. McNary: Okay. I thank you very much. . . .
Following this, defense counsel asked each of the jurors if he or she could consider a verdict of not guilty or of the lesser responsive verdicts of manslaughter or negligent homicide if the State did not prove its case beyond a reasonable doubt. Ms. Tinnerello responded, "Yes, I believe I could."
During the bench conference, defense counsel challenged for cause Mr. Maninna because he could not consider the intoxication defense. The trial court granted the challenge for cause. Defense counsel also challenged for cause Ms. Tinnerello. When the trial court asked why, defense counsel stated, "Oh, your Honor, she also she [sic] indicated that she was in agreement with Mr. Mannina [sic] that she could not consider the intoxication defense." In denying the challenge for cause as to Ms. Tinnerello, the trial court responded, "I think she was rehabilitated on that question. Sort of rehabilitated herself." A prospective juror's seemingly prejudicial response is not grounds for an automatic challenge for cause, and a trial judge's refusal to excuse her on the grounds of impartiality is not an abuse of discretion if, after further questioning, the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. See State v. Lee, 559 So.2d 1310, 1318 (La. 1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991); State v. Copeland, 530 So.2d 526, 534 (La. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989).
A trial judge must determine the challenge on the basis of the entire voir dire and on the judge's personal observations of the potential jurors during the questioning. Moreover, the reviewing court should accord great deference to the trial judge's determination and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify the jurors' qualification or disqualification. State v. Miller, 99-0192 (La. 9/6/00), 776 So.2d 396, 405-406, cert. denied, 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001). "[R]esponses during voir dire should be viewed as a whole, not on a piecemeal basis." State v. Fang, 2002-2812 (La. 10/21/03), 859 So.2d 649, 655.
While Ms. Tinnerello stated that she tended to support the police and that she felt the same way as Mr. Maninna regarding the defense of intoxication, we do not find that her overall responses suggested she would be unable to render an impartial verdict according to the law and the evidence. She informed the trial court that she would listen to and consider the evidence presented to her. She insisted to defense counsel that she would need to hear all of the evidence before making a determination of guilt or innocence. While her unexamined, single-sentence response about feeling the same way as Mr. Maninna tended to suggest her reservations about considering the defense of intoxication, the trial court was in the best position to determine whether she would discharge her duties as a juror in that regard. Upon reviewing the voir dire in its entirety, we cannot say that the trial court abused its discretion in denying defense counsel's cause challenge of Ms. Tinnerello.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant argues that the evidence was insufficient to support a conviction of second degree murder. Specifically, the defendant contends that his level of intoxication prevented him from forming the specific intent to kill or inflict great bodily harm. The defendant does not deny that he caused the victim's death.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; LSA-Const. art. I, §2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821B; State v. Ordodi, XXXX-XXXX (La. 11/29/06), 946 So.2d 654, 660. The Jackson v. Virginia standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. State v. Patorno, 2001-2585 (La. App. 1 Cir. 6/21/02), 822 So.2d 141, 144. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. Patorno, 822 So.2d at 144.
Louisiana Revised Statutes 14:30.1 provides in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of . . . aggravated burglary . . . even though he has no intent to kill or to inflict great bodily harm.
Louisiana Revised Statutes 14:15 provides in pertinent part:
The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
. . .
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
When defenses that actually defeat an essential element of an offense, such as intoxication, are raised by the evidence, the state must overcome the defense by evidence that proves beyond a reasonable doubt that the mental element was present despite the alleged intoxication. State v. Harris, 527 So.2d 1140, 1143 (La. App. 1st Cir. 1988).
Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Such state of mind can be formed in an instant. State v. Cousan, 94-2503 (La. 11/25/96), 684 So.2d 382, 390. Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. State v. Graham, 420 So.2d 1126, 1127 (La. 1982).
Defense witness, Dr. Raphael Salcedo, a forensic psychologist, testified at trial that, given the amount of alcohol the defendant drank on an empty stomach, he had serious doubts that the defendant went to the apartment with the specific intent of committing murder. On cross-examination, the prosecutor asked Dr. Salcedo if the defendant told him whether he ate anything. Dr. Salcedo responded:
Again, I'm trying to separate what he told me as opposed to what was in the  I think in the statement, it says that he hadn't had anything to eat. I don't know if I specifically asked him when I examined him personally, if I asked him that specific question.
Based on the guilty verdict, it is clear the jury found Dr. Salcedo's testimony unpersuasive. According to the defendant's own testimony, during the time he began to drink his first bottle of vodka, he consumed a box of chicken. Such information would have seemed particularly pertinent regarding the effect that food has on the rate of absorption of alcohol into the bloodstream, yet Dr. Salcedo was not even sure if he asked the defendant if he ate anything when he personally examined him. Also, given that specific intent can be formed in an instant, Dr. Salcedo's opinion that the defendant did not go to the apartment with the specific intent to kill would arguably have little, if any, legal significance.
The circumstances do not indicate that the defendant's intoxication precluded the presence of the specific criminal intent required for second degree murder. Rather, the defendant's actions indicate that he clearly knew what he was doing. The evidence at trial revealed that, even though the defendant was allegedly very intoxicated, he drove, without incident, from Abita Springs to Hammond at about 12:30 a.m. For the next few hours, the defendant sat in his truck across from Ahmed's apartment mulling over his plans. He was angry with Ahmed for breaking up his relationship with Nora. According to his confession, he remembered wanting to "cut" Ahmed. He had every opportunity to simply drive away. Instead, he armed himself with a knife, deliberately slashed the tires on both Ahmed's and Patel's cars and, in completely unprovoked fashion, kicked down the door to Ahmed's home and brutally attacked her and Patel. While he stabbed Ahmed only a few times, he repeatedly stabbed Patel, who was unarmed.[7] When the defendant finished stabbing Patel, he realized Ahmed had run out of the apartment. The defendant returned to his truck and drove back to Abita Springs.
When the defendant made it home, again without incident, he took off his bloody clothes and placed them in a trash bag. He also threw the knife he used to kill Patel into the woods. On direct examination, when asked if he did "all that" so he wouldn't get caught, the defendant responded, "Yes. Yes. I wanted to get away. And I wanted to flee and run and just keep running. And, of course, that means I knew what I had done was wrong. I knew what I had done was wrong." These are not the actions of a mindless drunk. They are deliberate acts indicating a clear mind. Further, flight and attempt to avoid apprehension indicate consciousness of guilt and, therefore, are circumstances from which a juror may infer guilt. State v. Fuller, 418 So.2d 591, 593 (La. 1982). We find the evidence that the defendant repeatedly cut and slashed Patel, inflicting a total of twenty-six wounds, particularly persuasive. The defendant's specific intent to kill or inflict great bodily harm can be inferred from the number of times he stabbed his victim. State v. Lutcher, 96-2378 (La. App. 1 Cir. 9/19/97), 700 So.2d 961, 973, writ denied, 97-2537 (La. 2/6/98), 709 So.2d 731.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261 (La. App. 1 Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. State v. Mitchell, 99-3342 (La. 10/17/00), 772 So.2d 78, 83.
After a thorough review of the record, we find that the evidence supports the unanimous guilty verdict. We are convinced that, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence that the defendant specifically intended to kill or do great bodily harm to Patel.
This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] According to his confession, at some point when the defendant was cutting the tires or getting ready to cut them, he walked up to Ahmed's apartment and tried to open the front door, but it was locked. He then went back downstairs.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The only question ever asked by Corporal Admire was at the hospital. He asked the defendant where the knife was. The defendant's response was ruled inadmissible by the trial court and suppressed. There was no testimony at the trial regarding Corporal Admire's question about the knife or the defendant's response.
[4] In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 n.2 (La. 1979).
[5] That Detective Sergeant Hall (or Lieutenant Muse) was not aware that the defendant had invoked his right to counsel is of no moment. Knowledge of such a request was imputed to him. Once the defendant has expressed his desire to deal with the police only through counsel, all successive officers who deal with the defendant are held to have knowledge of this fact. State v. West, 408 So.2d 1114, 1121 (La. 1982).
[6] Throughout the record, "Maninna" is repeatedly referred to as "Maninna" or "Manning."
[7] On direct examination, the defendant testified:

[W]hen I first went to the door, I felt like JD [Patel] had a weapon of some sort. And I don't know why I thought that. I didn't have any reason to think that. I know now I didn't have any reason to think that. But I thought they were going to fight me.
On cross-examination, the defendant testified that when he kicked the door in to Ahmed's apartment, he did not see Patel with a weapon.