822 So.2d 141 (2002)
STATE of Louisiana
v.
Randall PATORNO.
No. 2001 KA 2585.
Court of Appeal of Louisiana, First Circuit.
June 21, 2002.
*142 Walter P. Reed, District Attorney, Covington, Dorothy Pendergast, Metairie, Counsel for Appellee State of Louisiana.
*143 Margaret Smith Sollars, Appellate Attorney, Thibodaux, Counsel for Defendant/Appellant Randall Patorno.
Before: GONZALES, KUHN, and CIACCIO,[1] JJ.
KUHN, J.
The defendant, Randall Patorno, was charged by grand jury indictment with second degree murder in violation of La. R.S. 14:30.1, and he pled not guilty. After being tried by a jury, he was found guilty as charged. The defendant was subsequently sentenced to life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence. His motion to reconsider sentence was denied. He now appeals, urging the following assignments of error:
1. The verdict of the jury was contrary to the law and evidence.
2. The jury should have been instructed that they were required to find agreement as to ten of twelve as to which of the two provisions under La. R.S. 14:30.1 were applicable to this case.
We affirm.

FACTS
On March 23, 1999, Daniel Kuhl, a maintenance person who worked for Country Square Apartments in Slidell, Louisiana, went to the apartment complex to clean up a pile of trash that he noticed while walking with the owner of the apartment buildings the day before. Kuhl walked down a pathway from the edge of one of the buildings to a drainage canal and observed the debris located in the ditch. The pile of debris contained a roll of fencing and a Christmas tree. Kuhl realized that there was also a human body located in the pile of debris when he saw what he thought was a shoulder, a shirt, and an arm. Kuhl immediately used his cellular telephone to call 911 to inform the police of his discovery.
On March 14, 1999, several days before the discovery of the body, Brenda Carter reported that her seventeen-year-old nephew, B.C., who she had raised from the age of two, was missing. Her last contact with B.C. was when she dropped him off at work on the evening of Friday, March 12th. He worked at a McDonald's Restaurant in Slidell. B.C. did not come home after work Friday, and although Carter made several attempts to contact him by paging him and calling his associates, she did not hear from him on Saturday or Sunday. Carter decided to contact the police when she arrived home from work on Sunday night.
Detectives of the Slidell Police Department conducted an investigation as a result of the missing person report. Shortly before B.C.'s disappearance, he accompanied Vivian Pratt to the defendant's apartment. After getting off of work, B.C. met Pratt because she had located his pager, which he had lost the night before. They met in an area where drugs were frequently sold at a home referred to as "Big Bob's." B.C. sold drugs, specifically "crack" cocaine, and gave Pratt some drugs because she found and returned his pager. Pratt told B.C. that she would be walking to the defendant's apartment to use the drugs that he had given her and invited him to come along. B.C. decided to join her.
During the trial, Pratt testified that when they arrived at the defendant's apartment, she introduced B.C. to the defendant, and B.C. gave the defendant and Pratt some drugs in exchange for their *144 hospitality. B.C. then laid down on the defendant's love seat and fell asleep while the defendant and Pratt used the drugs. Pratt later awakened B.C. to ask him for more drugs so that she could sell them at "Big Bob's." According to Pratt, B.C. gave her about $100 worth of crack. She gave some of the drugs to the defendant and then left the apartment to sell the rest. When Pratt left the apartment at about 3:15 a.m., B.C. was sleeping on the defendant's love seat. After Pratt sold the drugs, she called the defendant's apartment to speak with B.C. but the defendant told her that B.C. had left. Pratt tried to contact B.C. several times by paging him but was unsuccessful.
As a result of the information received during the missing person investigation, the police executed a search warrant for the defendant's apartment and interviewed the defendant. During the interview, the defendant confirmed that B.C. had come to his apartment on the night in question. He stated, however, that B.C. was only there for a short period of time and that he left about thirty minutes after Pratt left to sell some of B.C.'s drugs. The defendant stated that he assumed that B.C. left to go look for Pratt since she never came back to the apartment with his money or the drugs.
After the body found by Kuhl on March 23rd was identified as B.C., the missing person investigation became a murder investigation. The police conducted a search of the area where the body was located and recovered a hammer and the victim's wallet and driver's license. The police also executed another search warrant for the defendant's apartment. The defendant was arrested and re-interviewed. During this interview, the defendant stated that after Pratt left his apartment to sell some of the victim's drugs, he began badgering the victim for more drugs. He further stated that, as a result, the victim became angry and pulled a gun out and the defendant hit him with a hammer three times in self-defense. The defendant was charged and subsequently convicted of second degree murder.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, the defendant contends that the verdict of the jury was contrary to the law and evidence. The defendant submits that while there is no question that his actions resulted in the death of B.C., he asserts that the evidence failed to establish beyond a reasonable doubt that he had the requisite specific intent to kill or to inflict great bodily harm. He also argues that his actions were the result of provocation or, in the alternative, legally justified under the circumstances. Finally, the defendant avers that there was no credible proof that an armed robbery occurred.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See La.Code Crim. P. art. 821. The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied, 532 So.2d 130 (La.1988).
Louisiana Revised Statute 14:30.1A provides, in pertinent part:

*145 A. Second degree murder is the killing of a human being:
[2] (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm....
Specific criminal intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Johnson, 461 So.2d 1273, 1277 (La.App. 1st Cir.1984).
In the instant case, a specific intent to kill or inflict great bodily harm can reasonably be inferred from the fact that the defendant repeatedly hit the victim in the head with a hammer. By the defendant's own version of the events, the initial blow to the head may have only stunned the victim and he did not fall to the floor. The defendant hit the victim in the head a second and third time with the hammer. Dr. MacKenzie, the coroner that performed the autopsy of the victim stated that the cause of death was blunt trauma to the head with a skull fracture, lacerations of the brain, and bleeding over surfaces of the brain. Inflicting several blows to a person's head with a hammer indicates an active desire to kill or inflict great bodily harm.
The defendant, secondly, submits that there was no credible proof that an armed robbery occurred. As delineated above, La. R.S. 14:30.1A(2) provides, as one basis for a conviction of murder, the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of armed robbery. La. R.S. 14:64A defines armed robbery as follows:
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
Louisiana Revised Statute 14:2(3) defines a dangerous weapon as any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.
Defendant does not contest that he was armed with a hammer and that this weapon was used to produce the death-causing injuries. Dr. MacKenzie, who testified as an expert in the field of forensic pathology, stated that the effect of the injuries produced by this weapon might have initially knocked the victim unconscious but would ultimately have resulted in death. The hammer clearly qualifies as a dangerous weapon. The issue is whether or not the defendant was taking or attempting to take anything of value belonging to the victim from the person of, or in the immediate control of, the victim at the time of the killing.
Pratt's testimony indicates that the victim had more drugs in his possession when she left him in the apartment with the defendant. The record clearly establishes that the defendant was a frequent drug user at the time of the offense. During videotaped interviews, the defendant admitted to using drugs while Pratt and *146 the victim were in the apartment and wanting more drugs once Pratt left the victim's apartment. Deputy Elsensohn of the St. Tammany Parish Sheriffs Office assisted in the crime scene investigation and testified that when the body was recovered the victim's pants were unzipped and the pockets of his pants were hanging out. Pratt testified that when the victim gave her some drugs to sell before she left the apartment, he retrieved the drugs from his "private area." Her testimony also indicated that the victim gave her about $100 worth of drugs to sell and had a total of about $200 worth of drugs in the bag. She did not, however, know whether the drugs in this bag were the full amount of drugs that the victim had in his possession at that time. Also, during his taped interview with the police, the defendant stated that he removed the remaining drugs and money off of the body after he checked the victim for vital signs and pulled his body into his bedroom. Whether the victim was killed before or after the taking is of no consequence in establishing the elements of the crime of armed robbery. State v. Brown, 96-1002, pp. 5-6 (La.App. 5th Cir.4/9/97), 694 So.2d 435, 437-438, writ denied, 97-1310 (La.10/31/97), 703 So.2d 19. We find that the jury could have reasonably concluded that the killing occurred while the defendant was engaged in the perpetration or attempted perpetration of an armed robbery.
The defendant also avers, however, that his actions were the result of provocation. Louisiana Revised Statute 14:31A(1) provides:
Manslaughter is:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed ....
The existence of "sudden passion" and "heat of blood" are not elements of the offense, but rather, are factors in the nature of mitigating circumstances which may reduce the grade of homicide. Provocation is a question of fact to be determined by the trier of fact. Thus, the issue is whether or not a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106, 110-111 (La.1986); State v. Smith, 490 So.2d 365, 370 (La.App. 1st Cir.), writ denied, 494 So.2d 324 (La.1986).
The guilty verdict in this case demonstrates that the jury concluded that the mitigatory factors were not established by a preponderance of the evidence. The only evidence presented during the trial of any provocation by the victim sufficient to cause sudden passion and heat of blood were the statements made by the defendant during interviews conducted after the body was found. The defendant submits that after he started badgering the victim for more drugs the victim became angry and threatened him with a gun. According to the defendant, these events occurred after Pratt left the victim and the defendant in the apartment. Thus, the defendant would be the only witness to such events. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st *147 Cir.1984). The jury's conclusion was supported by the record. Pratt testified that the victim was sleeping on the defendant's love seat when she left the apartment. Dr. MacKenzie testified that the lack of defensive wounds on the victim's body indicates that the victim was caught by surprise or unaware of imminent danger. We find that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence.
Finally, the defendant avers that his actions were legally justified under the circumstances as self-defense. When self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. Thus, the remaining issue in this case is whether or not a rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant did not kill the victim in self-defense. State v. Spears, 504 So.2d 974, 978 (La.App. 1st Cir.), writ denied, 507 So.2d 225 (La.1987).
Louisiana Revised Statute 14:20(1) provides:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
However, La. R.S. 14:21 provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
The defendant submits that when the victim threatened him with a gun, he had good reason to be fearful, especially when the victim's reputation as a drug dealer is considered. However, the defendant and Pratt also stated that before the night in question the defendant did not know the victim and the record does not indicate that the defendant had any knowledge of the victim's reputation. The defendant also argues that Pratt's testimony was not credible. This argument is not persuasive since, as stated above, as the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d at 38. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. State v. Creel, 540 So.2d 511, 514 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La.1989). The jury obviously rejected the defendant's claim of self-defense. The issue is whether or not this rejection was supported by the evidence presented by the State.
Initially, we note that there was no evidence in the record to support the defendant's claim that the victim was armed with a gun at the time of the killing. The State presented evidence to show that the police conducted a thorough search for a gun. The police were able to recover, along with the victim's body, the hammer used to inflict the death-causing injuries, and the victim's wallet and driver's license. Captain Swenson of the Slidell Police Department testified that after the hammer, wallet, and license were recovered, the police decided to block the canal and use a pump truck to pump the canal for other evidence. However, no further evidence was retrieved; no gun was ever found. *148 During one of his interviews with the police, the defendant stated that after he discarded the body and the weapon used to kill the victim, he later went to a boat launch area and threw the gun in the water. The police conducted an all-day search of the area where the defendant stated that the weapon was thrown, including a diving team, but again no gun was recovered. The defendant contends that the victim remained standing without dropping the gun after he had been hit the first and second time. This contention is refuted by the fact that the police discovered no bullet holes or any other evidence that a gun was present in the defendant's apartment.
The defendant correctly asserts that the lack of a weapon is not dispositive of the issue of self-defense because it is the reasonableness of apprehension and not the actuality of danger that determines the question of self-defense under La. R.S. 14:20. However, other than the hypothesis submitted by the defendant, the record does not support an existence of reasonable apprehension. As previously stated, Dr. MacKenzie testified that the victim's body did not have any defensive wounds indicating that a struggle took place, and he believed that the victim was unaware of the presence of danger.
The record supports the jury's rejection of the defense theory of justifiable homicide. A rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant did not kill the victim in self-defense. We note that the defendant's actions of disposing of the body and initially telling the police one story and then later, after the victim's body was recovered, relaying a completely different story are inconsistent with his self-defense argument. As we have also concluded that the record supports the jury's finding of the elements of murder and the rejection of the theory of manslaughter, we find that assignment of error number one is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, the defendant avers that the jury should have been instructed that it was required to find agreement as to ten of twelve under the same provision of La. R.S. 14:30.1. He submits that under the evidence presented in the case and the instructions given, it is entirely possible that the jury may not have reached the necessary agreement to support a second degree murder conviction under the same theory. The defendant further contends that because there is insufficient evidence of armed robbery and the jury may have based the conviction on the existence of an underlying armed robbery since the State pursued this felony theory, the verdict must fail for sufficiency of the evidence. Finally, the defendant avers that the verdict must fail because it does not convey the intention of the jury under La.Code Crim. P. art. 810. Defendant urges that his due process rights under the 14th Amendment of the United States Constitution and Article I, Section 2 of the Louisiana Constitution were violated.
Louisiana Code of Criminal Procedure article 807 states:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury....
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
*149 Louisiana Code of Criminal Procedure art. 802 requires the court to charge the jury as to the law applicable to the case. The refusal to give a requested special charge does not warrant reversal of a defendant's conviction unless it prejudices substantial rights of the accused. La.Code Crim. P. art. 921; State v. Marse, 365 So.2d 1319, 1324 (La.1978).
The defendant's requested special charge was as follows:
THUS, IN ORDER TO CONVICT the defendant of second degree murder, ten of you must find:
(1) that the defendant killed B.C., and
(2) that the defendant acted with a specific intent to kill or inflict great bodily harm upon B.C.;

or ten of you must find:
(1) that the defendant killed B.C., whether or not he had an intent to kill; and
(2) that the killing occurred while the defendant was engaged in the perpetration or attempted perpetration of armed robbery, first degree robbery, or simple robbery.
We note at the outset, as concluded in assignment of error number one, that the record contains sufficient evidence that the killing occurred while the defendant was engaged in the perpetration or attempted perpetration of an armed robbery. The trial judge properly instructed the jury on both theories of second degree murder. The jury was not polled regarding which theory of second degree murder the conviction was based upon. However, a jury is not constitutionally required to agree on a single theory to convict a defendant where it is instructed as to alternate theories. See Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). See also State v. Brown, 96-1002 at p. 4, 694 So.2d at 437; State v. Vergo, 594 So.2d 1360, 1364 (La.App. 2nd Cir.), writ denied, 598 So.2d 373 (La.1992). Thus, a conviction can be upheld if there is sufficient evidence based on either of the alternate theories with which the jury is charged.
In the instant case, the facts and circumstances of this killing, along with the trial judge's instructions on the elements and requirements of both sections of the second degree murder statute, support a conviction under both sections of the second degree murder statute. The jury's intent is well expressed in its verdict. For the foregoing reasons, we find no error in the trial court's refusal to give the requested special charge. This assignment of error is without merit.
For these reasons, we affirm the defendant's sentence and conviction.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The Honorable Philip C. Ciaccio, Judge (retired), Fourth Circuit Court of Appeal, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.