STATE OF LOUISIANA
v.
WAYLON Q. TURNAGE.
No. 2007 KA 2318.
Court of Appeal of Louisiana, First Circuit.
March 26, 2008.
NOT DESIGNATED FOR PUBLICATION
WALTER REED, District Attorney, LEWIS V. MURRAY, III, Assistant District Attorney, KATHRYN LANDRY, Attorney for Plaintiff/Appellee, State of Louisiana.
FREDERICK KROENKE, DMITRC I. BURNES, Attorney for Defendant/Appellant, Waylon Q. Turnage.
Before: GAIDRY, McDONALD and McCLENDON, JJ.
McDONALD, J.
Defendant, Waylon Turnage, was charged by grand jury indictment with one count of second degree murder. Defendant entered a plea of not guilty. Prior to trial, defendant filed an application for a hearing to determine his mental condition. Following a sanity hearing, the trial court found defendant competent to stand trial. Defendant was tried before a jury and found guilty as charged.
The trial court sentenced defendant to a term of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant appeals, arguing that the evidence is insufficient to support his conviction. Specifically, defendant contends that the State failed to negate his contention that he acted in self-defense.

FACTS
On April 6, 2006, George Seal, the brother of Jason Seal (the victim) received a telephone call from his father, John Seal, requesting that he go and check on Jason because Jason had not arrived at the barn for his milking shift. George Seal lived approximately 150 yards from Jason's trailer, so he went to his brother's residence and knocked on the door. Because there was no response, George looked through the window and saw Jason lying on the floor. According to George, he "could tell something was wrong." George testified he could tell Jason was dead and he first contacted his friend, Kirby Varnado, because he was unsure of what he should do. After speaking with Vamado, George contacted his father and asked that he come over, because something was wrong. After John Seal arrived, both men entered the trailer. At first, George thought that Jason may have suffered a heart attack, given his history of poor health.[1] As they started to roll Jason over, it was obvious Jason had been shot. George and John backed out of the trailer and contacted law enforcement.
Lieutenant Quenzell Spikes, of the Washington Parish Sheriff's Office, was one of the police officers dispatched to Jason Seal's trailer located on Mike Fisher Road. Lieutenant Spikes secured and photographed the crime scene and briefly spoke with George and John Seal outside of the trailer.
Marvin Jones, a cousin of defendant's, testified that on the evening of April 6, 2006, he had a conversation with defendant about a killing involving Jason Seal. Following this conversation, Marvin Jones and defendant's father, Larry Turnage, took defendant to the Washington Parish Sheriff's Office. On the way to the Sheriff's Office, defendant handed Marvin Jones two casings, which Jones placed in his pocket. At the Sheriff's Office, they met with Aubrey Jones, the Sheriff of Washington Parish.
Lieutenant Crain had responded to the crime scene earlier in the day. Around 10:00 p.m., he and Detective Guy Magee, also of the Washington Parish Sheriff's Office, were summoned to Sheriff Jones's personal office. When they arrived in the sheriff's personal office, they found Marvin Jones, Larry Turnage, and defendant. Defendant was escorted to the investigations office. As Lieutenant Crain was walking out, Marvin Jones pulled him aside and handed him two spent shell casings and stated that defendant had given them to him.
Once at the investigations office, defendant was advised of his rights, which he waived, and consented to questioning. Defendant participated in a taped interview wherein he stated that Jason Seal had contacted him around 9:00 p.m. the previous evening, and asked that he come over to his trailer. Upon his arrival at Jason's trailer, Jason asked him for some dope. Defendant stated that he explained to Jason that he no longer sold dope. Jason then went on to say that he could not pay defendant the $50.00 he owed him, because he had not received his Social Security check. Defendant stated that he told Jason this was not a problem, because his own son had not received his check, either. Jason then asked about defendant's son, and defendant explained that the child was actually his stepson. After another inquiry by Jason, defendant stated that when he went to prison years earlier, he asked a friend to "take care" of his wife and that this friend wound up raping defendant's wife. As a result, defendant's wife became pregnant and he and his wife were raising the child as their own.
According to defendant, Jason then stated that defendant's request of his friend seemed like he had granted his friend permission to engage in sexual relations with defendant's wife. Defendant told the police this comment triggered an argument and that Jason "jumped off" the sofa and defendant shot him in the chest with Jason's gun, which had been laying on the sofa console in the living room. After the first shot, Jason fell to the floor, and defendant stated that he shot Jason a second time in the back of the head. Defendant admitted he picked up the two spent shell casings and left with Jason's weapon.
At the crime scene, the police recovered one .380 bullet from inside the top pillow on the couch in the living room, and another bullet from a hole in the floor underneath where Jason's body was discovered.
Defendant told the police that he threw the weapon from his truck as he drove away, somewhere along Louisiana Highway 16 in Washington Parish. Defendant denied taking anything else from Jason's trailer.
The investigation revealed that Jason had the habit of emptying the contents of his pockets into a red coffee can. Jason's son, Scott Seal, testified that his father suffered from a heart condition and rheumatoid arthritis, and took a lot of medications that he also kept in this can. George Seal also testified about his brother's habit of keeping personal items such as his keys and money in this coffee can. Jason would frequently take this can with him, in order that he could have access to his medicine when it was time to take it.
During the investigation, the police learned that the red coffee can used by Jason was missing from his trailer. Following defendant's first taped statement a group of police officers conducted a search, beginning at La. Highway 16 and Cockern Road, following La. Highway 16 until it intersected with La. Highway 450. The police officers were searching for the gun defendant claimed he threw from his vehicle after shooting Jason. Defendant had also indicated to the police that he threw the shell casings out of the window of his vehicle, but the police already had the shell casings given to them by Marvin Jones.
Although defendant claimed he did not take the red coffee can from Jason's trailer, the police recovered a red coffee can on the side of La. Highway 16 approximately one quarter of a mile past Cockem Road on the right side of the highway. No weapon was recovered during this search.
The following day, April 7, 2006, defendant again waived his rights and agreed to speak with the police. During this statement, defendant admitted he put the shell casings in his pocket and gave them to Marvin Jones. Defendant accompanied the police officers as they proceeded to La. Highway 16 to resume their search for the weapon. On the way, defendant, who was riding in Detective Magee's unit, told the detective that the weapon could be found at his parents' house. Detective Magee informed the other officers of this information and the police and defendant proceeded to the home of the defendant's parents.
Detective Magee obtained consent to search the property from the defendant's mother. Defendant indicated that the weapon would be found in a pile of bricks near the corner of a fence connected to the house. Detective Magee walked over to this location and noted that a portion of a plastic bag was visible in the bricks. The bricks were removed and the police discovered a plastic bag containing a pistol, twelve rounds of ammunition, a magazine for the pistol, and keys, which were later matched to Jason Seal's trailer. A Nokia cell phone belonging to Jason was later brought to the police by defendant's wife.
Patrick Lane of the Louisiana State Police Crime Lab was accepted as an expert in the fields of crime scene investigation, forensic firearm investigation and ballistics, and latent fingerprint collection. Lane examined the firearm recovered from the pile of bricks and identified it as a .380 automatic High Point pistol, with serial number P831332.[2] Lane also examined the two casings turned over to the police and identified them as CCI .380 auto-cartridge cases.
Lane test fired the weapon into the bullet recovery tank at the State Police Crime Lab and compared the test bullets and cartridge casings to the recovered casings. Lane concluded that all had been fired from the same firearm, which was the .380 High Point pistol. Lane also testified that as part of the regular processing of a crime scene, nothing on the scene is moved until the police videotape and photograph the scene.
The State and defense counsel stipulated that Dr. Michael DeFatta performed the autopsy on Jason and if called to testify, he would testify in accordance with his autopsy protocol. Dr. DeFatta's autopsy report indicated Jason sustained a gunshot wound to his left abdomen, two and one-half inches left of the midline, and twelve inches from the top of his shoulder. The bullet travelled front to back, and moved very slightly upward, penetrating his heart and left-lower lung before exiting seven and one-half inches left of the midline, and nine inches from the top of his shoulder. Jason also sustained a second gunshot wound to the right portion of the top of his head one and one-half inches left of the midline. The bullet travelled to the right and slightly downward, and exited one and one-half inches right of the midline and three inches from the top of Jason's head. Dr. DeFatta's autopsy protocol noted that neither of these wounds had muzzle imprints or stippling associated with them.
Defendant did not testify at trial.

SUFFICIENCY OF THE EVIDENCE
In defendant's sole assignment of error, he contends that the evidence is insufficient to support his second degree murder conviction. Defendant specifically argues that the homicide was committed in self-defense and the use of the dangerous weapon was for the sole purpose of defending himself against the unprovoked attack by Jason Seal.
A conviction based on insufficient evidence cannot stand, as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this Court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); see also La. C.Cr.P. art. 821(B). This Jackson v. Virginia standard of review, incorporated in La. C.Cr.P. art 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. Patorno, 2001-2585, p. 5 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
La. R.S. 14:30.1 provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or inflict great bodily harm [1
Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. State v. Cousan, 94-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390. Specific intent need not be proven as fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126, 1127 (La. 1982).
La. R.S. 14:20 provides in pertinent part:
A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
In a homicide case, when self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. Thus, the issue in this case is whether a rational fact finder, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant did not kill the victim in self-defense. State v. Spears, 504 So.2d 974, 978 (La. App. 1st Cir.), writ denied, 507 So.2d 225 (La. 1987).
In the present case, the fact that the defendant killed the victim is not in doubt. The only issue is whether or not the defendant acted in self-defense. There were no witnesses (other than the defendant) to this homicide. Thus, the only evidence presented to establish what actually happened was the physical and medical evidence, and the audiotaped statements of defendant.
According to defendant's statement to the police, his visit with Jason Seal became argumentative following Jason's insinuation about defendant's wife being raped. Defendant stated that Jason Seal got off of the sofa and began "coming after" him. Defendant stated that he grabbed the gun that was lying on the sofa console and shot Jason Seal in the chest.
State Exhibit 55 is a diagram of the crime scene prepared by Louisiana State Police Trooper Richard Newman. In defendant's statement to the police, he claimed he was sitting on the armrest of the sectional sofa as he talked to Jason Seal. Defendant claimed he picked up the weapon that was lying on the console (a foldout table) of the sofa when the conversation turned argumentative. A bullet was removed from a pillow that was on the sofa, and another bullet was removed from the floor underneath where Jason Seal's body was discovered. Jason Seal's body was discovered lying face down in front of the sofa.
Defendant provided no indication that Jason Seal made any attempt to arm himself with the weapon as he got up off the sofa, nor did defendant indicate that Jason Seal made any physical contact with him. Even after the initial gunshot caused Jason Seal to fall, there was no further danger that Jason Seal presented to defendant. However, defendant shot Jason Seal a second time in the top of his head. This second infliction of deadly force upon Jason Seal, who was fatally wounded by the first gunshot, is inconsistent with a claim of self-defense.
Following the shooting, defendant picked up the bullet casings that had been ejected from the weapon and left. Although defendant initially told the police that he had thrown the weapon and casings out the window of his vehicle as he drove away, defendant later acknowledged that he had given the spent casings to Marvin Jones and had hidden the weapon in a pile of bricks at his parents' residence. Further, the defendant denied that he had taken anything else out of Jason Seal's trailer, but defendant's wife later turned over Jason Seal's cell phone to the police, which she had obtained from defendant, and the police also recovered the keys to defendant's trailer, which were in the same bag as the recovered weapon. Finally, the police recovered a red coffee can consistent with the container in which Jason Seal was known to keep his personal belongings such as his money, his cell phone, his keys, and his prescriptions. The red coffee can did not contain any medication when it was recovered along the side of La. Highway 16.
A finding of purposeful misrepresentation reasonably raises the inference of a "guilty mind," as in the case of flight following an offense or the case of material misrepresentations of facts following an offense. Lying has been recognized as indicative of an awareness of wrongdoing. State v. Captville, 448 So.2d 676, 680 n. 4 (La. 1984). In the present case, the facts established defendant fled the scene following the shooting and made material misrepresentations to the police regarding the whereabouts of the weapon and what items he removed from Jason Seal's trailer.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261, pp. 5-6 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932.
In finding defendant guilty, it is clear the jury rejected the defendant's assertion that Jason Seal's act of getting off the sofa and "coming after" defendant put defendant in imminent danger of losing his life or receiving great bodily harm, such that the killing was necessary to save himself [defendant] from that danger. Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant guilty of second degree murder, and rejected the theory of self-defense. Defendant told the police he and Seal had gotten into an argument, and Jason Seal, while unarmed, got off the sofa and went after defendant. At no point did defendant indicate Jason Seal attempted to arm himself. Moreover, the record indicates that while Jason Seal kept a weapon in his residence, he also suffered from rheumatoid arthritis and a heart condition. However, before Jason Seal even physically made contact with defendant, defendant grabbed the weapon from the console and shot defendant, causing him to fall on the floor. Defendant then shot Seal a second time, with this bullet entering the top of Jason Seal's head. Following the shooting, defendant picked up the ejected shell casings, Jason Seal's keys and cellular phone, and the red coffee can in which Jason Seal kept his personal belongings. Defendant lied to the police about his disposal of the weapon and taking these additional items from Jason Seal's trailer.
After reviewing the record, we find the evidence supports the jury's verdict. Moreover, we find the State sufficiently negated defendant's theory of self-defense.
This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] At the time of his death, Jason had been prescribed Lorcet, Valium, Methadone, Hydrocodone, and Diazepam.
[2] Scott Seal identified this weapon as looking like the weapon that belonged to his father, Jason Seal. According to Scott, his father sometimes kept this pistol on the console of the sofa in the living room.