STATE OF LOUISIANA
v.
JUANISKI FLANDA WILKERSON.
No. 2008 KA 1595.
Court of Appeals of Louisiana, First Circuit.
February 13, 2009.
Not Designated for Publication
ANTHONY G. FALTERMAN, District Attorney, DONALD D. CANDELL, Gonzales, Louisiana, Counsel for Plaintiff-Appellee State of Louisiana.
BENN HAMILTON, Baton Rouge, Louisiana, Counsel for Defendant-Appellant Juaniski Flanda Wilkerson.
Before: KUHN, GUDIRY, AND GAIDRY, JJ.
KUHN, J.
Defendant, Juaniski Flanda Wilkerson, was charged by bill of information with armed robbery, a violation of La. R.S. 14:64. Defendant pled not guilty and, following a jury trial, he was found guilty as charged. He filed a motion for postverdict judgment of acquittal, which was denied. Defendant was sentenced to ninety-nine years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. He filed a motion to reconsider sentence, which was denied. Defendant now appeals, designating the following three assignments of error:
1. The verdict of the jury is contrary to the law and the evidence.
2. The evidence presented to the jury was insufficient to support a conviction for armed robbery.
3. The trial court imposed an excessive sentence. We affirm the conviction and sentence.

FACTS
On May 6, 2002, at about 8:45 a.m., Clara Lewis arrived at her place of employment, Ace Check Cash (Ace) in Gonzales in Ascension Parish. As Lewis approached the door to unlock it and open for business, an unknown black male approached her and told her he needed to pay a bill. He had in his hand what Lewis described as a "white sheet of paper." Lewis told him to come back at 9:00 when they were open. The man walked away. Lewis entered Ace and turned on the "open" light. As she moved to turn on the light, the man grabbed her from the back and held a knife to her. The man ordered her to turn off the alarm. Lewis fell to the floor and began screaming. The man grabbed her off the floor and pulled her toward the door, where she turned off the alarm. The man then brought her to the office where the safe was located. She opened the safe. The man pulled a Wal-Mart bag with a roll of tape in it from his pants. As he did this, he placed the paper on the desk. The man took the money out of the safe and placed it in the Wal-Mart bag. He then ordered Lewis to get on the floor and taped her hands behind her back. At this point, a Quizno's employee from next door entered Ace. The man ran toward the back and exited the building, taking with him $37,000 in cash.
The "paper" Lewis referred to was actually a white envelope[1] left on the desk in Ace by the perpetrator. Detective Steve Nethken of the Gonzales Police Department retrieved the envelope. He lifted fingerprints found on the envelope and identified them as belonging to Terry Morgan. Detective Nethken located Morgan, and Morgan agreed to go to headquarters for an interview. After initially denying any involvement in the robbery, Morgan told Detective Nethken that he drove defendant to Ace in Morgan's mother's red Hyundai. Morgan stated he had no prior knowledge of defendant's plans to rob Ace. He further stated that the envelope that had his fingerprints on it was taken out of the Hyundai glove box and used by defendant. When Morgan saw defendant pull the knife out, he drove away. Defendant's fingerprints were not found on the envelope. Based on this information, Detective Sergeant James Groody, Jr., prepared a six-person photographic lineup, which included defendant's picture. When Lewis was shown the lineup, she immediately identified defendant as the person who robbed her. Lewis testified at trial, identifying in court that defendant was the person who robbed her at knifepoint.
Defendant was not apprehended until three years later. In February of 2005, Detective Nethken was contacted by someone from Elayn Hunt Correctional Center, who informed him defendant was incarcerated there. Defendant was brought to the parish prison in Donaldsonville and interviewed by Detective Nethken. Defendant initially denied any involvement in the robbery. According to Detective Nethken, when he told defendant he knew about Morgan and had not charged Morgan, defendant told him, "Well, you've got me and I want to give you Terry[.]"
Morgan testified at trial. He had prior convictions for possession of a gun and a stolen car. He had been out of jail for less than three months when he drove defendant to Ace. Morgan stated that he knew defendant, but they were not friends or related. Morgan and defendant had a mutual first cousin. Morgan denied robbing anyone. He denied that he took the envelope out of the car or went into Ace with it. On cross-examination, Morgan was asked to explain how the envelope with his fingerprints on it got inside of Ace. Morgan responded that defendant must have taken the envelope into Ace, despite his not having seen defendant take the envelope out of the glove box or take the envelope with him inside of Ace.
Nelson Naquin, defendant's cellmate for about three days at Winnfield Correctional Institute, testified at trial. According to Naquin, defendant admitted to him that he committed the armed robbery at Ace. According to Naquin, defendant told him that he and another person collaborated on the robbery plan. Defendant's friend, Terry Morgan, dropped off defendant in front of Ace, and defendant went in. Defendant had an envelope in his right hand so it would appear he was trying to cash a check. Naquin also stated that, shortly following the armed robbery, defendant went to Florida. Naquin subsequently wrote a letter to the District Attorney's Office of the 23rd Judicial District Court in Gonzales. The letter contained all the information about the armed robbery defendant had told Naquin while they shared a jail cell. The letter was introduced into evidence at trial.

ASSIGNMENTS OF ERROR NOS. 1 AND 2
In these two assignments of error, defendant contends the evidence was insufficient to convict him of armed robbery. Specifically, he asserts the evidence failed to prove his identity as the perpetrator of the armed robbery.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const, amend. XIV; La. Const, art. I, § 2, The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. C.Cr.P. art. 821(B); State v. Ordodi, XXXX-XXXX, p. 10 (La. 11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). The Jackson v. Virginia standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 2001-2585, pp. 4-5 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not secondguess those determinations. State v. Hughes, XXXX-XXXX, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051.
La. R.S. 14:64(A) provides:
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
Armed robbery is a general intent crime. In general intent crimes, the criminal intent necessary to sustain a conviction is shown by the very doing of the acts which have been declared criminal. State v. Payne, 540 So.2d 520, 523-24 (La. App. 1st Cir.), writ denied, 546 So.2d 169 (La. 1989).
In his brief, defendant suggests that Morgan was the perpetrator of the armed robbery because Morgan's fingerprints, not defendant's, were found on the envelope secured from the crime scene. Morgan indicated in his testimony that his fingerprints were on the envelope because he placed all of the "papers" in the glove box, and the envelope was part of that group of papers. When Morgan was asked on cross-examination how the envelope got inside Ace, he responded that defendant must have taken it in there. Morgan further testified, however, that he did not see defendant take the envelope inside, nor did he see defendant retrieve anything from the glove box before he went inside. He further points out in his brief that Lewis "consistently maintained that the most promising and most distinguishing feature of the robber's face was [sic] his bushy eyebrows." This assertion is erroneous. Neither Lewis nor Detective Sergeant Groody, who was also asked about bushy eyebrows, recalled this physical characteristic of the defendant with any specificity. On cross-examination, the following colloquy took place between Lewis and defense counsel regarding the description of bushy eyebrows:
Q. Do you remember how you described that person to them at that time?
A. I told them that he was a black male, kind of husky, shaggy, looked like he needed a shave.
Q. Was there anything else that in your mind stood out as an outstanding feature about this person?
A. I knew he wasn't  I mean, he was in between 20, his late 20's and early 30's because he didn't look old.
Q. Do you recall making a statement to the officers that he had real bushy eyebrows?
A. If I made that statement?
Q. You don't remember making it?
A. I don't remember.
On cross-examination, the following colloquy took place between Detective Sergeant Groody and defense counsel regarding the description of bushy eyebrows:
Q. She tried to give you a description as best as she could; isn't that correct?
A. That's correct.
Q. Is there anything about the description she gave where she pointed to any particular distinguishing feature on the face of the suspect?
A. She mentioned, I believe, that he was unshaven.
Q. Unshaven?
A. Unshaven and had a distinctive voice.
Q. Did she mention anything about his eyebrows?
A. I don't recall.
Q. Let me refer your attention to a little exchange between you and her and see if you remember that. This is you, Groody. Okay. You say "Well, describe him to me[."] This is Ms. Lewis. "He was a black male. He had a bush, not a big bush. He was scraggly looking. You know, he was kind of scraggly but not like a bum, but he looked like he needed a shave[."] You, "Okay[."] This is Ms. Lewis. "Had bushy eyebrows, brown eyes. I only seen that when I sat down on the floor and looked at him[."] Do you remember that?
A. Not really. Not particularly.
Despite the attempt by defendant to elevate this issue beyond its relevance or importance, Lewis's and Detective Sergeant Groody's testimony would seem to suggest that defendant's eyebrows were an unremarkable feature. In his examination of Detective Sergeant Groody, defense counsel refers to a taped statement Lewis gave Detective Sergeant Groody when she described the perpetrator. Neither the taped statement nor a transcript of the statement was introduced at trial. Accordingly, where the, perhaps single, reference to bushy eyebrows fits within the entirety of Lewis's statement is unclear. Defendant also states in his brief that a simple visual inspection of the photographic lineups will reveal that Morgan has "extremely bushy eyebrows" while defendant does not. We have reviewed the photographic lineups and do not find any measurable degree of accuracy regarding this statement. "Bushy" is a relative term. Moreover, Lewis did not have the luxury of comparing one set of eyebrows to another when, shortly after the armed robbery, she described the perpetrator's eyebrows as bushy. In her estimation, based on her personal, subjective view, she felt the perpetrator's eyebrows were bushy. On cross-examination, defense counsel showed Lewis the photographic lineup containing defendant's picture, and the following colloquy took place:
Q. This is the person you chose?
A. Yes, sir.
Q. Will you look at that person's eyebrows for me if you don't mind. Would you consider that bushy eyebrows?
A. Yes, sir.
Q. What about the picture in the top right, would you consider that bushy eyebrows?
A. Yes, sir.
Q. You consider that bushy eyebrows?
A. Yes, sir.
When defense counsel asked Detective Sergeant Groody what did the term "bushy" connote, the following colloquy took place:
A. It's a very subjective term.
Q. Bushy is subjective?
A. Compared to somebody who is bald. I mean, compared to Mr. Sheets [prosecutor], you have extremely bushy hair. Compared to someone else, you might not have extremely bushy hair. It's a subjective term. It's kind of relative, you know what I mean. Compared to what? Bushy is compared to not bushy. That was her relating to me that she considered it bushy. I can't say what she considers bushy.
There are other discrepancies regarding Morgan's involvement in the armed robbery, such as the type of vehicle he and defendant were in before Lewis was approached, and whether Morgan was the person who dropped defendant off at Ace. Morgan testified that he drove defendant to Ace in his mother's red Hyundai Elantra, and that he owned an inoperable gray Cutlass. However, Naquin testified defendant told him two vehicles were involved, "an old Cutlass or something like that," and a small vehicle, "like a red hatchback." Naquin further testified defendant stated that Morgan dropped him off in front of Ace. Naquin's letter that he wrote to the District Attorney's Office, however, stated that Morgan was to pick up defendant after the robbery in a red two-door coupe, and that Morgan's friend, who drove an old shabby Oldsmobile, was the one who dropped defendant off in front of Ace. Detective Nethken testified that employees at Gonzales Optical, which was next door to Ace, told him there was a group of black males in the parking lot in what appeared to be an old Delta '88 or '98. On direct examination, Lewis testified that, when she arrived at Ace, she noticed a couple of cars in the parking lot and, particularly, a car in front of the "optical place" that had two black males in it. On cross-examination, Lewis testified she had seen an older car and a newer car in the parking lot. The older car was "like a tannish, vanilla, brownish color," and the newer car was red. Lewis remembered there were people in the "beige" car. It is not clear if she saw anyone in the red car. Lewis was asked, "Do you know if there [were] any people in the red car?" She responded, "I don't remember people in the red car but there was."
Based on these conflicting accounts, the extent of Morgan's involvement in the armed robbery is unknown. Morgan denied that he participated in the armed robbery. He testified that when he saw defendant pull a knife and grab Lewis, he left the scene and went home. Detective Nethken testified Morgan was not charged in this case. In any event, the level of Morgan's involvement is immaterial because the evidence established defendant, despite his assertion to the contrary, robbed Lewis at knifepoint. Morgan testified that when defendant got out of the car, he approached Lewis. He described defendant as wearing black jeans, a plaid shirt, and a cap. Morgan observed Lewis put the key in the door. When she entered and turned on the "open" sign, defendant grabbed her by the neck while holding a knife. Lewis began to yell. Morgan did not observe anything else beyond this point because he left. This scenario, as described by Morgan while testifying, was essentially the same scenario related to Detective Nethken by Morgan during Detective Nethken's interview of Morgan.
Both Naquin's trial testimony and his letter to the District Attorney's Office indicated defendant robbed Lewis at knifepoint and that he was not picked up by anyone immediately following the robbery. As such, defendant hid out for some time in a drainage canal culvert, not far from Ace. When defendant was finally picked up by a family member, he left behind his baseball cap and $4,100 in cash in the culvert. Naquin's letter stated defendant was wearing black pants and a cap. Detective Nethken testified at trial that $4,100 in cash was found at the bottom of the "washout basin" in a bayou that crosses under Douglas Street, which is the street right behind Ace.
Most importantly, Lewis positively identified defendant in court as the person who robbed her at knifepoint. She described in detail how defendant approached and grabbed her, put a knife to her, forced her to turn off the store alarm, took the money from the safe, and bound her hands with tape. She testified defendant told her, "I should kill you." The robbery took place in the morning, and nothing in the record suggests defendant had something over his face or attempted to cover his face when he robbed Lewis. Lewis was able to clearly observe defendant, as suggested by the following testimony on direct examination:
A. When I went into the place, I turned the open light on because I wasn't coming back out in the lobby. I went to turn on the light. When I went to turn on the light, somebody grabbed me from the back. They had a knife to me. I apologize for what I'm about to say, but he said "Bitch, turn off the alarm." I turned around and I said what. I fell to the floor. When I fell to the floor, he was just standing there looking at me. He just kept talking to me.
Q. Did you see him at that time?
A. Yes, I was looking up at him.
On cross-examination, regarding Lewis's observation of defendant, the following exchange took place:
Q. That person kind of snuck in. At that point is when you saw the knife?
A. I felt the hand and I flipped around and I saw the knife.
Q. Saw the knife. Do you know about how long you were in contact with this invader person?
A. To me, it seemed like a long time.
Q. I guess it did. A long time. You were terrified. In real time can you estimate how long it might have been?
A. It seemed like he was there a long time.
Q. Seemed like he was there a long time. I know this is kind of hard. Did you look this person directly in the face?
A. Yes, I did.
Q. And he looked directly at you?
A. Yes.
Based on the information gathered during his investigation, Detective Sergeant Groody prepared two separate six-person photographic lineups. One lineup contained a photograph of Morgan, and the other lineup contained a photograph of defendant. Three days after the robbery, Detective Sergeant Groody showed Lewis the lineup with Morgan in it. Lewis did not identify anyone in the lineup. The next day, which was four days after the robbery, Detective Sergeant Groody showed Lewis the lineup with defendant in it. Detective Sergeant Groody testified, "She immediately, without hesitation, identified Mr. Wilkerson's photograph and stated that that's him. She signed the back of the thing and said that's the man that robbed me and put that on the back and timed and dated it. I signed underneath it." Later while testifying, the prosecutor asked Detective Sergeant Groody, "Did you find that Ms. Clara Lewis' demeanor was honest?" Detective Sergeant Groody responded:
Yes. It was also accentuated in the fact that with Mr. Morgan's photograph she didn't make any identification on him or anybody near him. I mean, a lot of times I've had people that would identify somebody mistakenly, but she passed it up. She wouldn't even say he kind of looks like. No. She said that's not him. Until I showed her one of the individual that she marked, and then she immediately and without hesitation, that's him.
On cross-examination, Lewis was emphatic about the identity of defendant in the photographic lineup:
Q. You knew that was him. Let me ask you this now. Recognizing the trauma and terror of the experience that you went through, not questioning that, not trying to belittle that, minimize that, is it possible you could be mistaken?
A. No, sir.
Q. You absolutely do not believe that you are mistaken?
A. I am not mistaken.
It is clear from the finding of guilt the jury concluded the testimony of Morgan, Naquin, and Lewis was credible and reliable enough to establish defendant's guilt. In finding defendant guilty, it is clear the jury rejected the defense's theory of misidentification. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. State v. Taylor, 97-2261, pp. 5-6 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell, 99-3342, p. 8 (La. 10/17/00), 772 So.2d 78, 83.
After a thorough review of the record, we find the evidence negates any reasonable probability of misidentification and supports the jury's unanimous guilty verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendant was guilty of armed robbery.
These assignments of error are without merit.

ASSIGNMENT OF ERROR NO. 3
Defendant maintains that the trial court imposed an excessive sentence. Specifically, he contends that, in imposing the maximum sentence, the trial court did not adhere to the provisions of La. C.Cr.P. art. 894.1 by failing to consider mitigating circumstances.
The Eighth Amendment to the United States Constitution and Article I, section 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La. 1979). A sentence is considered constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks one's sense of justice. State v. Andrews, 94-0842, pp. 8-9 (La. App. 1st Cir. 5/5/95), 655 So.2d 448, 454. The trial court has great discretion in imposing a sentence within the statutory limits, and such a sentence will not be set aside as excessive in the absence of a manifest abuse of discretion. See State v. Holts, 525 So.2d 1241, 1245 (La. App. 1st Cir. 1988). Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of La. C.Cr.P. art. 894.1 need not be recited, the record must reflect the trial court adequately considered the criteria. State v. Brown, 2002-2231, p. 4 (La. App. 1st Cir. 5/9/03), 849 So.2d 566, 569.
The articulation of the factual basis for a sentence is the goal of La. C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475, 478 (La. 1982). The trial judge should review the defendant's personal history, his prior criminal record, the seriousness of the offense, the likelihood that he will commit another crime, and his potential for rehabilitation through correctional services other than confinement. See State v. Jones, 398 So.2d 1049, 1051-52 (La. 1981).
In the instant matter, the trial court imposed the maximum sentence of ninety-nine years at hard labor under La. R.S. 14:64(B). While the trial court did not mention La. C.Cr.P. art. 894.1 by name, it is clear from its reasons for judgment at sentencing that it considered the article. The trial court stated defendant's age and that he was officially classified as a third-felony habitual offender. The trial court noted that sentencing was deferred and a presentence investigation report was ordered. The trial court reiterated the facts of the case. According to the trial court, the probation officer who prepared the presentence investigation report contacted Ascension Parish Assistant District Attorney Stephen Sheets, who recommended defendant receive the maximum sentence. Further, Major Benny Delaune of the Ascension Parish Sheriffs Office recommended that defendant receive the maximum sentence. Accordingly, the Department of Public Safety and Corrections, Division of Probation and Parole, recommended that defendant be sentenced to ninety-nine years at hard labor. We note from our review of the presentence investigation report that defendant has convictions for simple robbery and purse snatching.
This court has stated that maximum sentences permitted under statute may be imposed only for the most serious offenses and the worst offenders, or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. State v. Hilton, 99-1239, p. 16 (La. App. 1st Cir. 3/31/00), 764 So.2d 1027, 1037, writ denied, XXXX-XXXX (La. 3/9/01), 786 So.2d 113. Considering the trial court's careful review of the circumstances, the presentence investigation report, defendant's status as a multiple offender, and the fact defendant poses an unusual risk to public safety, we find no abuse of discretion by the trial court. Based on his criminal record and in committing what we find to be the worst type of offense in the category of armed robbery, wherein defendant brutalized a woman at knifepoint for monetary gain, we find him to be the worst type of offender. See State v. Mickey, 604 So.2d 675, 679 (La. App. 1st Cir. 1992), writ denied. 610 So.2d 795 (La. 1993). Accordingly, the sentence imposed is not grossly disproportionate to the severity of the offense and, therefore, is not unconstitutionally excessive.
This assignment of error is without merit.

DECREE
For these reasons, we affirm the conviction of and imposition of sentence against defendant, Juaniski Flanda Wilkerson.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The envelope had another envelope inside.