NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

DOCKET NUMBER
2021 KA 1347

STATE OF LOUISIANA

VERSUS

CHRISTOPHER PAUL GLENN

Decision Rendered **APR 0 8 2022**

* * * * *

ON APPEAL FROM THE
21ST JUDICIAL DISTRICT COURT, DIVISION E
LIVINGSTON PARISH, LOUISIANA
DOCKET NUMBER 37,823

HONORABLE BRENDA BEDSOLE RICKS, JUDGE PRESIDING

* * * * *

Prentice L. White
Baton Rouge, LA

Attorney for Defendant-Appellant
Christopher Paul Glenn


Scott M. Perrilloux
District Attorney
Zachary Daniels
Assistant District Attorney
Livingston, LA

Attorneys for Appellee
State of Louisiana

BEFORE: McDONALD, LANIER, and WOLFE, JJ.

**McDONALD, J.**

The Livingston Parish grand jury charged defendant, Christopher Paul Glenn, by bill of indictment with one count of second degree murder, a violation of La. R.S. 14:30.1 (count one); one count of attempted second degree murder, a violation of La. R.S. 14:30.1 and La. R.S. 14:27 (count two); and, one count of attempted first degree rape, a violation of La. R.S. 14:42 and La. R.S. 14:27 (count 3). The defendant pled not guilty to each count.[1] After a trial, a jury unanimously found him guilty as charged on each count. The trial court denied his motion for new trial, motion for post-verdict judgment of acquittal, and motion for arrest of judgment. The trial court sentenced him to life imprisonment on count one and to fifty years imprisonment on counts two and three. All three sentences are to be served at hard labor and without the benefit of probation, parole, or suspension of sentence. The trial court imposed counts two and three concurrent to each other but consecutive to count one. The trial court later denied the defendant's motion to reconsider sentence. The defendant now appeals, challenging the sufficiency of the evidence and claiming the trial court imposed an excessive sentence. For the following reasons, we affirm the convictions and sentences.

## FACTS

On June 4, 2018, the defendant, his wife, J.G., his four children, and his mother-in-law, T.S., lived together in a house in Denham Springs, Louisiana.[2] That night, the defendant stabbed and killed T.S. while she slept in her bedroom. The defendant then went to the room where J.G. was asleep, lured her to another room, strangled her until she lost consciousness, cut off her clothing with a pair of scissors, and attempted to force her to engage in sexual intercourse, as she regained consciousness and struggled in an attempt to get away. J.G. ultimately escaped and ran to the home of a neighbor, Vanessa McElroy. As Ms. McElroy described at trial, when J.G. arrived, she had

---

[1] The defendant later withdrew his pleas of not guilty and pled not guilty and not guilty by reason of insanity to each count. He subsequently withdrew those pleas and retained his original plea of not guilty to each count.

[2] As one of the charged crimes is a sex offense, we use initials to protect the identity of the victim and certain family members. La. R.S. 46:1844W.

2

scratches all over her neck, a bloody nose, bruises, and welts. Ms. McElroy called 911, informed the dispatcher of what occurred and that the defendant was driving away from the residence. The 911 dispatcher advised Ms. McElroy to check to see if T.S. was still alive. Ms. McElroy and J.G. walked to the residence, unlocked T.S.'s bedroom door with a key, and saw T.S. lying in bed in a pool of blood and cold to the touch.

Deputy Derek Brantley of the Livingston Parish Sheriff's Office (LPSO), Uniform Patrol, was dispatched to the scene and given a description of the defendant's vehicle. While en route to the residence, Deputy Brantley spotted a vehicle that fit the description of the defendant's vehicle and called for assistance. After checking the license plate number and verifying that it was the defendant's vehicle, Deputy Claire Naquin stopped the vehicle and ordered the defendant to exit. Deputy Brantley arrived, advised the defendant of his *Miranda* rights,[3] and handcuffed him. After being advised of his rights, the defendant made statements in reference to stabbing T.S.

After the defendant was transported to the Livingston Parish courthouse, LPSO Detective Joseph Ballard and LPSO Deputy Sean Lange also advised the defendant of his *Miranda* rights and reviewed a waiver-of-rights form with him. The defendant stated that he understood his rights, signed the waiver-of-rights form, and participated in two separate recorded interviews with Detective Ballard[4] and Deputy Lange. During the recorded interviews, the defendant fully confessed to stabbing T.S. to death and to attempting to kill and have non-consensual sex with J.G.[5]

### ASSIGNMENT OF ERROR NUMBER ONE

In assignment of error number one, the defendant argues that he did not intend to attack or stab T.S. but was provoked to do so when he overheard T.S. condone J.G.'s desire to divorce him, although it was J.G. who had committed adultery. He asserts that the facts of this case suggest that he reacted instantly. Thus, he argues

---

[3] Specifically, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the officers informed the defendant of his right to remain silent, that anything he said may be used against him, and that he had a right to retained or appointed counsel.

[4] LPSO Sergeant Lance Landry was also present and participated during the interview by Detective Ballard.

[5] While defendant was at the Livingston Parish courthouse, LPSO Detective Jeff Beatty observed that he had a cut to his right pinky finger and blood splatter on his shirt and body.

3

his response to being told that his wife had an affair and wanted a divorce was a result of sudden passion or heat of blood. He maintains that, as a high-ranking combat veteran, being told his wife had sexual intercourse with another man and wanted to restrict or eliminate his access to his children caused him to completely lose all control and respond in compliance with his military training. He argues that there was no evidence that he plotted to kill or injure his wife and mother-in-law. He concludes the jury omitted mitigating factors during deliberation that should have led them to return with a manslaughter conviction.[6] In response, the State contends the jury rejected the defendant's argument that the murder occurred in a sudden passion and argues it would be out of the scope of a sufficiency review for this court to substitute its appreciation of the evidence for that of the jury.

A conviction based on insufficient evidence cannot stand as it violates Due Process. *See* U.S. Const. amend. XIV; La. Const. art. I, §2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. *See* La. C.Cr.P. art. 821B; *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Ordodi*, 06-0207 (La. 11/29/06), 946 So.2d 654, 660; *State v. Landry*, 19-0486 (La. App. 1 Cir. 2/21/20), 297 So.3d 8, 14. The *Jackson* standard of review, incorporated in La. C.Cr.P. art. 821B, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. *State v. Patorno*, 01-2585 (La. App. 1 Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the

---

[6] The defendant challenges the convictions on counts one and two of second degree murder and attempted second degree murder, as to the evidence to prove the element of specific intent and the existence of mitigating factors, but does not challenge the conviction on count three of attempted first degree rape.

4

defendant is guilty unless there is another hypothesis that raises a reasonable doubt. *Landry,* 297 So.3d at 14.

Second degree murder is pertinently defined as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1A(1). Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); *Landry,* 297 So.3d at 15. Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the factfinder. *Landry,* 297 So.3d at 15.

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27A. The gravamen of attempted second degree murder is the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill *or* to inflict great bodily harm," a conviction for attempted second degree murder requires specific intent to kill. *See* La. R.S. 14:30.1A(1) and 14:27A (emphasis added); *State v. Giroir,* 18-1295 (La. App. 1 Cir. 4/10/19), 2019 WL 1551736, *3 (unpublished).

Manslaughter is a homicide that would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. La. R.S. 14:31A(1). "Sudden

5

passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigating factors in the nature of a defense. If a defendant establishes those factors by a preponderance of the evidence, a murder verdict is not appropriate. *State v. Eby*, 17-1456 (La. App. 1 Cir. 4/6/16), 248 So.3d 420, 424-25. Provocation and time for cooling are questions for the jury to determine using an average-person standard, a person with ordinary self-control. *Id.* at 425. If a person unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. *State v. Pinestraw*, 16-0553 (La. App. 1 Cir. 10/31/16), 2016 WL 6427714, *3 (unpublished).

At trial, J.G. testified that she and the defendant were "separated" at the time of the offense but still living together in the family home along with their four children and her mother, the deceased victim, T.S. Prior to the attacks, while the children were asleep, J.G. and T.S. conversed before also going to bed in their separate sleeping areas. Specifically, T.S. was sleeping in one of the bedrooms, J.G. slept on the couch, while the defendant, to J.G.'s knowledge, was in the master bedroom, where he slept with their nine-month-old baby. At some point, the defendant awakened J.G. and told her that she needed to get the baby, claiming that the baby was in the bedroom screaming. After J.G. entered the master bedroom, she turned around, as the baby was not crying. The defendant had shut the bedroom door and began to strangle her. As she unsuccessfully attempted to fight off the defendant, she fell to the floor, and the defendant got on top of her and continued to strangle her until she lost consciousness.

J.G. stated that when she regained consciousness, "He [the defendant] was raping me." Her clothes had been cut, removed, and were on the floor. She struggled and attempted to get the defendant off of her, as she called out to her mother for help. At that point, the defendant told J.G. "that he had already killed her" mother. J.G. asked to see her children and the defendant grabbed some clothes from the dresser to allow her to get dressed to check on the children. The defendant allowed J.G. to make a bottle for the baby, who was screaming at that point. After she gave the bottle to the baby, the defendant brought J.G. to the bedroom where her mother was located. The defendant unlocked the bedroom door and allowed J.G. to see her mother who was

6

lying in the bed and was covered in blood. He then allowed her to go check on two of their children, who were in their bedroom located near the front door of the home. While in the bedroom, J.G. told the defendant that she also wanted to see her oldest child who was asleep in the playroom. When the defendant turned around and began walking towards the playroom, J.G. unlocked the front door and ran out. J.G. ran down the street to Ms. McElroy's residence, who then called 911, reported the incident, and informed the operator that the defendant was in the process of leaving the home.

On cross-examination, J.G. testified that she and the defendant had been separated for about a month prior to the incident, although they were still living together. She noted that the defendant had been asking to reconcile, but she told him no. She admitted having an affair with another man leading up to the incident. J.G. testified that she told the defendant she was seeing someone else about a week or a week and a half before the incident and that she had spent the entire weekend before the incident with the other man. While the defendant was hurt and angry when she told him about the affair, she did not recall them having a fight or altercation as a result. She further confirmed that she had previously told the defendant she wanted a divorce but denied that they had ever talked about custody of the children or child support. As to the defendant having any history of being violent, she noted that she had to call the police once, stating, "I think he had hit me or something like that." She noted that the defendant was working overseas for the military during that time. When asked if there were any other incidents of the defendant putting his hands on her or anyone else and whether or not the defendant's behavior on the night in question was normal for him, J.G. gave a negative response to each question. When further asked if it seemed as though the defendant "snapped" on the night in question, she stated, "Yes, I would say so." However, she also stated that the defendant appeared to be acting rationally that night when interacting with her and seemed like himself "for the most part."

LPSO Detective Jeff Beatty and Detective Ballard responded to the residence to process the scene. As Detective Beatty walked through and photographed the scene, he observed blood on the floor in the hallway leading to a bedroom. Detective Ballard

7

noted that keys were in the bedroom door at the time. When they entered the bedroom, they saw T.S. laying on the bed with a pool of blood under her head and what appeared to be multiple stab wounds to her neck. They also observed a large amount of blood splatter on the wall near the victim in a cast-off pattern. The officers followed blood drops that led to the kitchen and to the kitchen sink where they observed and recovered a bloody knife with a black handle. They continued to follow the blood trail in the house to the living room and master bedroom where they observed and seized a similar knife with a black handle and a serrated edge, but with no apparent blood on it, laying on the floor at the foot of the bed. The officers further observed a small pool of blood by the bed and collected a pair of scissors from the dresser and female clothing from the floor that appeared to have been cut with scissors. In addition to photographing the residence and T.S., Detective Beatty further photographed J.G. and observed her injuries, including red marks around her neck consistent with strangulation and dried blood on the top of her head.

Deputy Brantley testified that, at the time of the defendant's arrest, when he was asked what occurred that night, the defendant stated, "[I] lost it." Sergeant Kyle Hotard arrived after Deputy Brantley had placed the defendant under arrest, advised him of his rights, and detained him in the police unit. Sgt. Hotard questioned the defendant in the unit. The defendant explained that T.S. was turning his wife against him. He further told the officer that he went to the bedroom with a knife while T.S. was sleeping, stabbed her in the right side of the neck multiple times, subsequently put the knife in the sink, and left the scene.

During each of the recorded interviews, the defendant was asked what happened before the police were dispatched to his residence. The defendant explained that J.G. was cheating on him and that T.S. was turning J.G. against him, which led to their "divorce." The defendant stated that he learned of J.G.'s affair and plans to leave him about a week before the incident in question. The defendant stated that J.G. was not trying to hide the affair. He further noted that J.G. "was all over Facebook with it." The defendant stated that when he came home on the night in question, he overheard a conversation between T.S. and J.G. in which his mother-in-law was "bad mouthing"

8

somebody. He went to sleep, but woke up a few hours later; he "flipped" and got extremely angry, as he thought about T.S. "[filling] my wife's head up with who knows what." The defendant confirmed that he blamed T.S. for the ending of his marriage and that he killed her first because she "was the biggest actor." He specifically admitted to entering the bedroom and stabbing T.S. multiple times while she was asleep. He stated that T.S. did not wake up during the stabbing.

Consistent with J.G.'s testimony regarding the attack on her, the defendant further indicated that he told J.G. that she needed to get the baby. After J.G. entered the bedroom, he began choking J.G. as she fought back. He stated that he "choked her out" and that she stopped breathing. The defendant stated that he grabbed a pair of scissors, cut J.G.'s clothes off, and threw her on the bed. He explained that he wanted to rape and kill her, because he wanted to punish her for cheating on him and for leaving him. The defendant repeatedly admitted that he wanted to rape and kill J.G., stating that he attempted to have sex with her but "couldn't get it up." The defendant further explained that he wanted to rape J.G., because he wanted to be the last person with whom she had sex. When J.G. "came to," she again began fighting off the defendant, and the baby started crying. At that point, the attack ended. The defendant also admitted telling J.G. that her mother was dead, showing her the knife that he had used, and taking her to the bedroom where her mother lay. He denied previously wanting to kill J.G. or her mother, stating, "something triggered, something clicked." The defendant stated that he and J.G. had been married for five years before the incident, and he only recalled being violent (*i.e.,* slapping her) on one prior occasion.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Dorsey,* 10-0216 (La. 9/7/11), 74 So.3d 603, 634. Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of witness credibility, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's

9

determination of guilt. *State v. Lavy*, 13-1025 (La. App. 1 Cir. 3/11/14), 142 So.3d 1000, 1006.

Herein, the jury heard the testimony of all the witnesses and saw the pretrial police interviews. The jury observed the defendant calmly describe the events that led to the offenses, the actual offenses, and explaining his actions to the officers. The verdict rendered in this case indicates that the jury rejected the defendant's theory that the offenses occurred in sudden passion or heated blood. Testimony presented at trial showed that J.G. told the defendant that she was seeing someone else and wanted a divorce at least a week prior to the offenses. Based on these circumstances, we find that the jury could have reasonably determined that an average person's blood would have cooled at the time the offenses were committed. Further, the jury could have reasonably determined that the circumstances were insufficient provocation to deprive a reasonable man of self-control to the point that he would commit murder.

Moreover, we note that the defendant's actions were not entirely consistent with someone who lost complete control, as he locked the bedroom door after killing T.S., manipulated J.G. into entering another room before attacking her, and drove away from the scene before the police arrived. After considering all of the evidence presented in the light most favorable to the State, we find that it was reasonable for the jurors to conclude that the defendant's anger did not preclude the presence of specific intent. Thus, we cannot say that the jury's determination was irrational under the facts and circumstances presented. *See Ordodi*, 946 So.2d at 662. Considering the testimony and the defendant's own statements during his confessions, the jury could have rationally concluded that the defendant had the specific intent to kill both victims.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *See State v. Calloway*, 07-2306 (La. 1/21/09), 1 So.3d 417, 418 *(per curiam)*. An appellate court impinges on a factfinder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that the factfinder reasonably rejected. *See State*

10

*v. Mire,* 14-2295 (La. 1/27/16), 269 So.3d 698, 703 *(per curiam).* After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and attempted second degree murder. Thus, assignment of error number one lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In arguing that the sentences are excessive and unconstitutional, the defendant notes that he was given "[devastating] news" that his wife had an extramarital affair, that she wanted a divorce, and that she would oppose him receiving any visitation rights with their children. He further notes that he is a first-felony offender. The defendant contends that the trial court abused its discretion in imposing a sentence that shocked one's sense of justice given the fact that the evidence showed that he is a war veteran who acted in the heat of passion. The defendant further contends that he is not among the worst of all offenders. Also, the defendant claims that the trial court failed to address any of the sentencing factors listed in La. C.Cr.P. art. 894.1 before announcing its sentence. He concludes that the imposition of a life sentence consecutive to two concurrent fifty-year sentences was excessive, cruel, and unconstitutional.

The Eighth Amendment to the United States Constitution and Louisiana Constitution Article I, §20 prohibit the imposition of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. *State v. Sepulvado,* 367 So.2d 762, 767 (La. 1979); *State v. Honea,* 18-0018 (La. App. 1 Cir. 12/21/18), 268 So.3d 1117, 1120. A sentence is constitutionally excessive if it is grossly disproportionate to the severity of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *Honea,* 268 So.3d at 1120.

11

Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of La. C.Cr.P. art. 894.1 need not be recited, the record must reflect that the trial court adequately considered the criteria. Remand is unnecessary when a sufficient factual basis for the sentence is shown, even where the trial court has not fully complied with La. C.Cr.P. art. 894.1. *State v. Lanclos,* 419 So.2d 475, 478 (La. 1982); *State v. Graham,* 02-1492 (La. App. 1 Cir. 2/14/03), 845 So.2d 416, 422.

A trial court is given wide discretion in the imposition of sentences within statutory limits, and an appellate court will not set aside the sentence as excessive unless there is a manifest abuse of that discretion. *State v. Collins,* 09-1617 (La. App. 1 Cir. 2/12/10), 35 So.3d 1103, 1108. Thus, on appellate review of a sentence, the relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Smith,* 01-2574 (La. 1/14/03), 839 So.2d 1, 4; *State v. Spikes,* 17-0087 (La. App. 1 Cir. 9/15/17), 228 So.3d 201, 205. This court has stated that maximum sentences permitted under statute may be imposed only for the most serious offenses and the worst offenders or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. *See State v. Parker,* 12-1550 (La. App. 1 Cir. 4/26/13), 116 So.3d 744, 754.

If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C.Cr.P. art. 883. Thus, La. C.Cr.P. art. 883 specifically excludes from its scope sentences which the court expressly directs to be served consecutively. A trial judge retains discretion to impose consecutive penalties based on the offender's past criminality, violence in the charged crimes, or the risk he poses to the general safety of the community. *State v. Thomas,* 98-1144 (La. 10/9/98), 719 So.2d 49 *(per curiam).* Although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. *State v. Alexander,* 20-1337 (La.

12

App. 1 Cir. 10/18/21), 2021 WL 4851320, *6 (unpublished). Moreover, the failure to articulate specific reasons for imposing consecutive sentences does not require remand if the record provides an adequate factual basis to support the consecutive sentences. *State v. Green,* 15-0308 (La. App. 1 Cir. 12/17/15), 2015 WL 9260586, *13 (unpublished).

Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1B. Whoever commits the crime of attempted second degree murder shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence. *See* La. R.S. 14:27D(1)(a) & 14:30.1B. Whoever commits the crime of attempted first degree rape shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence. *See* La. R.S. 14:27D(1)(a) & 14:42D(1).

Courts are charged with applying a statutorily-mandated punishment unless it is unconstitutional. *State v. Dorthey,* 623 So.2d 1276, 1278 (La. 1993). It is incumbent on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional by "clearly and convincingly" showing that:

> [he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.

*State v. Johnson,* 97-1906 (La. 3/4/98), 709 So.2d 672, 676; *State v. Adams,* 07-0386 (La. App. 1 Cir. 11/2/07), 2007 WL 3407507, *8 (unpublished).

In this case, for the defendant's conviction of second degree murder, the trial court imposed life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. For his convictions of attempted second degree murder and attempted first degree rape, the defendant was sentenced to fifty years at hard labor on each count, without the benefit of parole, probation, or suspension of sentence. The trial court expressly directed that the fifty-year sentences be concurrent to each other

13

but consecutive to the life sentence. Thus, the consecutive nature of the sentences is beyond the scope of La. C.Cr.P. art. 883. *See Alexander,* 2021 WL 4851320, at *6.

At the sentencing hearing, an impact statement prepared by the members of the victims' family was read to the trial court. The letter detailed T.S.'s life and the family's emotional suffering due to the loss of T.S., including her grandchildren who also lost the defendant, their father, as a result of the defendant's actions. J.G.'s statement was also read to the trial court wherein she described her mother as an amazing, beautiful person who loved her grandchildren. She noted that her mother was her best friend and "rock" and described how she would be missed. She further stated that her mother did not deserve to be killed and that she was "the only one pushing for me to have my marriage fixed."

We note that the trial court heard the evidence presented at trial, including the defendant's confessions. As to the sentence imposed for the second degree murder offense, we note that the defendant's sentence of life imprisonment at hard labor is the mandatory minimum under the statute and, thus, is presumed constitutional. It is therefore incumbent upon the defendant to rebut this presumption. Based upon our review of the record in this case, we do not find that the defendant has clearly and convincingly shown that he is exceptional. The defendant made no showing of exceptional circumstances to justify a lesser sentence.[7] As to the consecutive nature of the sentencing, we note that while the crimes all occurred during a single episode, there were two victims. During the defendant's brutal attack in which he attempted to kill and rape her with their infant daughter present in the room, J.G. called out to her mother, only to be told by the defendant that he had already killed her mother. The defendant then showed her the bloody body of her mother, who he had stabbed to death while she was asleep. Further, the defendant committed these horrific crimes while his four children were present in the same house. After reviewing the evidence presented at trial as to the manner in which the offenses were committed, we are

---

[7] We note that after the imposition of the sentences, it was noted for the record that the instant offenses are crimes of violence and that the sex crime in this case was the defendant's second sex offense. Further, the State dismissed obstruction of justice and violation of protective order charges in connection with this case.

14

convinced that the defendant is the worst of offenders and committed the worst of offenses. The record before us clearly establishes an adequate factual basis for the sentences imposed. Therefore, we find the trial court did not abuse its discretion by imposing the sentences in this case. Assignment of error number two lacks merit.

**CONVICTIONS AND SENTENCES AFFIRMED.**