**NOT DESIGNATED FOR PUBLICATION**

**STATE OF LOUISIANA**

**COURT OF APPEAL**

**FIRST CIRCUIT**


**2022 KA 1363**


STATE OF LOUISIANA

VERSUS

JOHN PAUL WASHINGTON


Judgment Rendered: **SEP 15 2023**

\* \* \* \* \* \*

On Appeal from the Seventeenth Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Docket No. 588055
Honorable Kirk A. Vaughn, Judge Presiding[1]


\* \* \* \* \* \*

Kristine M. Russell
District Attorney
and
Jason L. Chatagnier
Joseph S. Soignet
Assistant District Attorneys
Thibodaux, Louisiana

Counsel for Plaintiff/Appellee
State of Louisiana


Gwendolyn K. Brown
Baton Rouge, Louisiana

Counsel for Defendant/Appellant
John Paul Washington


\* \* \* \* \* \*


**BEFORE:  McCLENDON, HESTER, AND MILLER, JJ.**

---

[1] Judge John E. LeBlanc presided over the trial.

**McCLENDON, J.**

Defendant, John Paul Washington, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1, and pled not guilty. A unanimous jury found him guilty as charged. He filed a combined motion for a new trial and for a post verdict judgment of acquittal, but the motion was denied. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. He now appeals, challenging the sufficiency of the evidence. For the following reasons, we affirm the conviction and sentence.

## FACTS

The victim, Travontae Williams, worked at a barber shop in the Midland neighborhood in Thibodaux. On May 25, 2019, at approximately 2:00 a.m., Travontae was shot in his head and fatally shot in his abdomen, when the projectile perforated the right common iliac artery.

Thibodaux Police Department Captain Aaron Barnes, then a sergeant in the Detectives Bureau, testified that he responded to the crime scene at the intersection of Plantation Road and Midland Drive in Thibodaux. When he arrived on the scene, he observed Travontae's body lying on the sidewalk adjacent to 1400 Plantation Road. Two 9mm bullet casings were found in the front yard of 1400 Plantation Road, one 9mm casing was found on a vehicle parked in the driveway, and three 7.62 bullet casings were found under the carport. A Smith & Wesson SD40 pistol[2] was located next to Travontae's body.

Stephon Williams testified Travontae was his "little cousin." The day before the murder, May 24, 2019, defendant picked up Stephon at the barber shop and took him for a ride. Thereafter, Travontae gave Stephon a ride from the barber shop back to his home in Cortez, where he fell asleep. At 11:43 p.m., defendant sent a text message to Stephon's phone, stating, "Son I no u got my shit son I won't my money r my shit[.]"

Captain Barnes testified Travontae's cell phone contained text messages between Travontae and defendant. The text messages indicated that defendant believed Stephon

_____

[2] The handgun had been reported stolen.

2

had stolen something from defendant, and defendant wanted it back. The text messages also indicated that Travontae attempted to intervene on behalf of Stephon by offering to pay for the item.[3]

The police determined that defendant owned a Buick Roadmaster, and a witness at the scene saw a large-bodied vehicle, either a Buick Roadmaster or a Chevrolet Caprice, leaving at a high rate of speed. The police obtained a search warrant and went to defendant's home, where they found a grey Buick Roadmaster. A search of the vehicle was conducted. Thereafter, defendant's brother, Ricky Washington, arrived in a white Buick Roadmaster. After obtaining Ricky Washington's consent, the police also searched his vehicle. Nothing of evidentiary value was found in either vehicle.

Thibodaux Police Department Detective Jacob Thibodeaux assisted the investigation by providing geographical location evidence and obtaining search warrants for defendant's phone and the cell phone provider's phone records. Detective Thibodeaux testified that geographical location evidence indicated that on May 25, 2019, between 1:45 a.m. and 2:00 a.m., defendant was on the East side of Audubon Street,[4] near his cousin Danzell Washington's residence in the Plantation Trace apartment complex; at 2:03 a.m., defendant was in the Midland area of Thibodaux, very close to Midland Drive and Plantation Road; and at 2:22 a.m., defendant was in the area of his home on Violet Street. Analysis of Danzell Washington's phone records, using geographical locating, revealed multiple overlapping points with the location of defendant's phone at several times surrounding the incident.

---

[3] Forensic examination of Travontae's phone revealed the following exchange of text messages:

> [Defendant; 5/25/2019, 12:52:57 a.m.]: Son I got to go with my move on that boy I fill like a bihh
>
> [Travontae; 5/25/2019, 12:54:01 a.m.]: Yea y'all could fight
>
> [Defendant; 5/25/2019, 12:56:08 a.m.]: Boy no that's 300 fuck fighting it is what is son I fuck with u son but I can't go out like that
>
> [Travontae; 5/25/2019, 12:57:31 a.m.]: That my blood Brudda
>
> [Defendant; 5/25/2019, 12:57:54 a.m.]: Ya that's mind to
>
> [Travontae; 5/25/2019, 12:58:54 a.m.]: Nah me n duke blood all that gun play shit over with potna
>
> [Travontae; 5/25/2019, 12:59:52 a.m.]: Getcha one cause that shit gone turn out bad
>
> [Travontae5/25/2019, 1:00:33 a.m.]:    Bet

[4] The record reflects that witnesses referred to the street as both Audubon Drive and Audubon Street during trial.

3

Darius Lewis testified that on May 25, 2019, he was living on "Audubon" in the Plantation Trace neighborhood of Thibodaux. He went to the apartment of his friend, Danzell Washington, to play video games. Lewis testified that defendant arrived at the apartment at approximately midnight, complaining that someone had stolen something from his car. Defendant expressed anger at "the cousin of the guy that took the suspected stuff out of the car." Lewis further testified that defendant's phone was on speaker while he argued with someone, and Lewis overheard defendant and the man on the phone threatening to kill each other. Lewis tried to defuse the situation by telling defendant that no one needed to lose their life and, if the man wanted to pay for what his cousin had taken, defendant should take the money and "just leave it alone." Defendant, however, told Danzell Washington he wanted to get a gun and kill the man. Danzell Washington went into the back of the apartment, changed into all black clothing, retrieved a long gun and another firearm, and gave the weapons to defendant. Lewis then left the apartment.

Lewis testified he saw defendant and Danzell Washington in a rental car, possibly a Chrysler 300. He stated that on May 25, 2019, at approximately 3:00 a.m., Danzell Washington called him and asked him to pick him up from French Lane. When Lewis arrived at the scene, he saw the rental car and learned that someone had lost the key so the vehicle could not be driven.

In a June 28, 2019 statement, Lewis told the police that Danzell Washington stated he had lost the keys to the rental car. Additionally, Lewis indicated a short dark-skinned man, a light-skinned man "with dreads," and a third man named "Mal" or "Jamaal" were with Danzell Washington. At trial, Lewis conceded that defendant was neither short nor had he ever had "dreads."

Danzell Washington was further developed as a suspect on the basis of a recording provided by a concerned citizen. While the recording was not entered into evidence, Captain Barnes testified that it involved Darius Lewis and contained "very detailed information about things that took place that night of the incident and that linked into our investigation and that really wasn't [publicly] known." Based on the recording, Detective Barnes interviewed Darius Lewis, and "advised him we [were] aware of the

4

recording . . . of the phone call he made describing or retelling all the information that he had learned about the incident to someone else." Darius Lewis "admitted" that "the information that he had stated was accurate."

In addition, the telephone records obtained and reviewed in connection with the investigation indicated that Danzell Washington called Travontae at approximately 1:45 a.m. on May 25, 2019, and geographical location evidence placed the phones of defendant and Danzell Washington in the area of the Plantation Trace Apartments and Audubon Street at 1:47 a.m. on May 25, 2019, and Midland Drive and Plantation Road at 2:00 a.m. Thus, the geographical location evidence for Danzell Washington's phone mirrored the geographical location evidence for defendant's phone for the period under investigation, suggesting the men were together at that time. Subsequently, Danzell Washington was also arrested for the murder of Travontae.

Captain Barnes conceded it was rumored that Travontae was having a sexual relationship with Danzell Washington's girlfriend. Additionally, a caller to Crime Stoppers alleged that Jovonta Johnson had put a "hit" on Travontae. However, this claim could not be verified.

At the time of Travontae's death, he was in a relationship with Calnashia Duncan, who was pregnant with his child. On May 24, 2019, Travontae picked up Duncan from work at 11:00 p.m. and took her to her mother's house to eat. The couple then left to go home. On the drive home, Travontae got a phone call from "John."[5] The call was about something that happened earlier in the day.

After the couple arrived home, Travontae went to the store. When he returned, Travontae was very scared because someone had threatened to shoot up the house. Thereafter, Travontae armed himself with a gun, and the couple left to go to Duncan's mother's house. Prior to arriving, however, Travontae stopped the car and got out in the Midland area. He started walking, and Duncan followed in the car because he was angry. Duncan saw Travontae stop and talk to a brown man with "dreads." Duncan called Travontae and asked him to get back in the car, but he refused. Travontae told Duncan

---

[5] Duncan had no other identifying information concerning the caller.

to leave, and she complied with his request because she was pregnant and they were in a dangerous place.

After Duncan left Travontae, she continued to her mother's house, which was about two minutes from the Midland area. While parked outside, Duncan called her friend "Jamaal" and asked him to call Travontae. Duncan heard gunshots, prompting her to drive back to the area where she had left Travontae. Duncan further testified that, at some point while she was "sitting," after she left Travontae but before she heard the gunshots, a white vehicle with tinted glass stopped next to her. Duncan could tell that more than one person was in the vehicle, but she was unable to see anyone's face.

Sometime on May 25, 2019, Michael Edmond was on the bench in his yard in Midland when he saw Travontae.[6] Edmond approached Travontae to ask him for a cigarette. Travontae was on the phone with someone and was "kind of mad." After the telephone call, Travontae stated he and "Johnny" "got into it" earlier. Travontae did not have a cigarette, so Edmond walked back home. As Edmond was about to enter his home, he heard approximately five gunshots. The first few shots sounded louder than the following shots.

In a July 3, 2019 police interview, Edmond was asked if he was under the impression that Travontae was talking to "John" on the phone. Edmond answered Travontae was talking to someone else.

Jamaal Tillman testified that, during the night of May 25, 2019, Duncan asked him to call Travontae. Tillman called Travontae as soon as he got off the phone with Duncan. Tillman was in a club with loud music and could not hear what Travontae said. Tillman exited the club to continue the call, but by that time, the call had disconnected on Travontae's side.

On May 25, 2019, defendant gave a voluntary statement to the police. Captain Barnes testified that defendant became agitated when questioned about Stephon. Defendant claimed he was at home with his girlfriend, Alicia Henry, on the night of the incident. Thereafter, Alicia Henry stated defendant picked her up from work on May 24,

---

6 Edmond testified he did not know what time it was, but it was after dark.

6

2019, at 10:00 p.m., and took her home, where they both remained for the rest of the night. Geographical location evidence, however, contradicted that claim. Further, surveillance video from a gas station on Louisiana Highway 1 and Canal Boulevard showed Alicia Henry drove to the store in her vehicle and was present inside the store after 3:00 a.m. Additionally, numerous phone calls were made from defendant's phone to Travontae, Stephon, and others during the time defendant claimed he was sleeping.

Defendant provided a buccal swab of cells, but a comparison of his DNA with evidence at the scene did not reveal a match. Gunshot residue testing of defendant's hands was also negative.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number one, defendant contends the evidence is insufficient to support the conviction. In assignment of error number two, he contends the trial court erred by denying the motion for a new trial and for a post-verdict judgment of acquittal. He combines the assignments of error, arguing the evidence was insufficient to prove his identity as the gunman or as a principal to the offense. He argues there was evidence Travontae was having an affair with Danzell Washington's girlfriend, and thus, Danzell Washington had an independent motive to kill Travontae. He further argues Travontae had many enemies, and a caller to Crime Stoppers alleged Javonta Johnson had taken out "a hit" on Travontae.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV, § 1; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See LSA-C.Cr.P. art. 821(B); **State v. Patorno**, 2001-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 144; **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The **Jackson** standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the fact finder must be

7

satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 822 So.2d at 144. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Bessie**, 2021-1117 (La.App. 1 Cir. 4/8/22), 342 So.3d 17, 22, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802.

Second degree murder is defined in pertinent part as "the killing of a human being: (1)[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" LSA-R.S. 14:30.1(A)(1). Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). The State bears the burden to prove those elements, along with the burden to prove the identity of the defendant as the perpetrator. When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. **Bessie**, 342 So.3d at 22-23.

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. LSA-R.S. 14:24. Under the law of principals, all persons involved in the commission of a crime are equally culpable; therefore, a person may be convicted as a principal to murder even if he did not personally inflict the fatal wound. **State v. Cabellero**, 2022-0441 (La.App. 1 Cir. 11/4/22), 356 So.3d 389, 395, writ denied, 2022-01777 (La. 4/25/23), 359 So.3d 982, citing **State v. Posey**, 2008-0746 (La.App. 1 Cir. 9/26/08), 2008 WL 4376811, *3 (unpublished); **State v. Clark**, 2020-167 (La.App. 5 Cir. 11/18/20), 306 So.3d 619, 631, writ denied, 2020-01459 (La. 2/17/21), 310 So.3d 1150; **State v. Massey**, 2011-357 (La.App. 5 Cir. 3/27/12), 91 So.3d 453, 463-64, writ denied, 2012-0991 (La. 9/21/12), 98 So.3d 332 ("Whether a defendant actually fires the bullet that strikes and kills a victim is of no consequence and the defendant may be convicted as a principal to the crime."). However, an individual may only be convicted as a principal

8

for those crimes for which he personally has the requisite mental state. **Cabellero**, 356 So.3d at 395.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. **State v. Southall**, 2022-0746 (La.App. 1 Cir. 6/2/23), ___ So.3d ___, ___, 2023 WL 3862595, *6, citing **State v. Dorsey**, 2010-0216 (La. 9/7/11), 74 So.3d 603, 634, cert. denied, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012). Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. **Southall**, ___ So.3d at ___, 2023 WL 3862595 at *6.

At trial, the State presented evidence that defendant had a motive to kill Stephon Williams, and that Travontae actively intervened in the situation. Specifically, defendant's text messages to Stephon's phone and to Travontae's phone indicated that shortly before the killing, defendant was angry with Stephon for taking defendant's "shit," and "had to go with [his] move on [Stephon]" because defendant felt "like a [bitch]." Defendant's messages with Travontae reflect Travontae's intervention. Lewis's testimony placed defendant at Danzell Washington's apartment shortly before the killing, and indicated that defendant exchanged death threats with the cousin of the man defendant suspected had taken something from him – Travontae. Lewis also testified that defendant rejected Lewis's pleas to "just leave it alone," and that Danzell Washington handed defendant a long gun and another firearm, after defendant stated he wanted to get a gun and kill the man. Geographical location evidence placed defendant and Danzell Washington together in the area of the crime at the time of the killing. Defendant's alibi for the time of the killing was discredited by geographical location evidence, surveillance video, and his own phone records. Further, the recovery of two different kinds of bullet casings from the crime scene and the testimony of Edmond that he heard shots of differing decibels supported the State's theory that two gunmen shot Travontae.

9

The jury apparently rejected the hypotheses that the murder was committed solely by Danzell Washington or by some other person. Moreover, considering the evidence presented at trial, the jury could have rationally concluded that defendant was a gunman in this case. See **Bessie**, 342 So.3d at 26. Thus, in reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See **Bessie**, 342 So.3d at 26, citing **Ordodi**, 946 So.2d at 662.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. **Bessie**, 342 So.3d at 26, citing **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. **Bessie**, 342 So.3d at 26, citing **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (*per curiam*). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder, and defendant's identity as the perpetrator. See **Bessie**, 342 So.3d at 26.

These assignments of error are without merit.

**CONVICTION AND SENTENCE AFFIRMED.**

10